EDWARD LEVY ET AL. *v.* DUNDALK COMPANY

[No. 25, January Term, 1940.]

638

*Decided March 5th, 1940.*

The cause was argued before BOND, C. J., OFFUTT, PARKE, SLOAN, MITCHELL, JOHNSON, and DELAPLAINE, JJ.

*Maurice J. Pressman,* for the appellants.

*Boyd B. Graham,* with whom were *Marbury, Gosnell & Williams* on the brief, for the appellee.

PARKE, J., delivered the opinion of the Court.

The pending appeal in the cause brings up for determination whether, on the facts of this record, a provision in a deed poll, that no part of any building erected or kept on the land conveyed shall be within seventeen feet of a designated street line, is a collateral or personal promise of the vendee, or imposes upon the land conveyed a restriction running with the land, which is enforceable

in equity against the vendee, and his assignees with notice or without a valuable consideration. The substantial facts are not in controversy and they will be first stated.

A portion of the land in Baltimore County of John W. Sparks was laid off before 1917 into alleys, streets and town lots for the purpose of advantageous sale. The plat of this development was duly recorded, and shows that this particular area was bounded on the north by a way called Ventnor Terrace, on the east by one named Dundalk Avenue, which ran northwestwardly and southeastwardly, on the south by a third, designated Baltimore Avenue, and on the west by a fourth, to be known as Willow Avenue.

The boundary thoroughfares on the north and on the south were parallel to each other, as was Patapsco Avenue, which was located midway between them. As shown by the Sparks plat, a small triangular piece of land, with an area of but 270 square feet, was situated in the northeastern corner of the tract. This unmarked bit of land had its apex in the southern margin of Ventnor Terrace, a frontage of 45 feet on the western line of Dundalk Avenue, its base of 12 feet on an alley between it and Lot No. 35, and an altitude of 43 feet on a twenty-foot way which converged with Dundalk Avenue until their union at Ventnor Terrace. This undesignated triangular piece of land, and Lot No. 35 of the plat, are in the northern block of lots between Ventnor Terrace and Patapsco Avenue. Lots Nos. 16, 15, 14, 13 and 12, on Dundalk Avenue, were in the southern block between Patapsco Avenue and Baltimore Avenue. The triangular piece of land, and Lots Nos. 35, 16, 15, 14, 13 and 12, are all of the lots which front on Dundalk Avenue, between Ventnor Terrace and Baltimore Avenue. The other lots of the division were to the west of those fronting on Dundalk Avenue. Of these lots, Nos. 11, 10, 9, 8, 7, 6, and 5, along with the southern boundary of the corner lot, No. 12, front on the northern side of Baltimore Avenue.

Dundalk Avenue is divided into east and west side Dundalk Avenue by the private right of way of an electric railway which is forty feet in width and runs, with the course of the avenue, between these parallel divisions. The carrier's double railway tracks of T-rail construction occupy the company's exclusive right of way, which effectually separates the use of the avenue. On the plat the width of the west section of Dundalk Avenue is given as twenty-five feet, which is inclusive of five feet for a sidewalk. A crossing of the railway tracks is made for Baltimore Avenue, but the other ways begin at the western boundary line of Dundalk Avenue and extend westwardly, through the Sparks development, with which this appeal is concerned, and the adjacent tracts, which form part of the present suburban settlements of Saint Helena and of Colgate Park.

The Dundalk Company obtained, on May 5th, 1917, title to all the lots in the Sparks development, except Lots Nos. 12, 15, 16 and 35, which faced on the west side of Dundalk Avenue, and the row of adjoining lots, Nos. 6, 7, 8, 9, 10 and 11, and the easternmost half of Lot No. 5, which, with the southern boundary line of Lot No. 12, had a frontage of 344 feet on the northern line of Baltimore Avenue. The frontage of all the lots on the west side of Dundalk Avenue and between Ventnor Terrace and Baltimore Avenue is 441 feet. Of the lots not conveyed, Nos. 15 and 16 have a continuous frontage, but are separated from Lot No. 35 by Patapsco Avenue, and from Lot No. 12 by an alley and Lots Nos. 13 and 14. The sum of the frontage of each of these excepted lots is 334 feet. The remaining discontinuous frontage of 107 feet on the west side of Dundalk Avenue is the combined frontage (62 feet) of the adjoining lots, Nos. 13 and 14, and of the triangular lot whose situation and impractical dimensions of a frontage of 45 feet, a base of 12 feet, and an altitude of 43 feet, make it apparently of negligible value for residential or commercial occupation.

While the lots laid off in the Sparks tract were subject to certain use restrictions relative to the sale of alcoholic

liquors on the premises, neither the lots which had been previously conveyed before the grant to the Dundalk Company, nor those conveyed to it, were subject to any building restrictions.

The Dundalk Company acquired in 1917 other extensive tracts of land in Dundalk and its vicinity, and on July 13th, 1918, conveyed a large part of its holdings to the United States Shipping Board Emergency Fleet Corporation. By this deed the company transferred all of its lots in the Sparks tract, except the lots numbered 13 and 14, and the small unnumbered triangular piece which has been described, and which, for brevity, will be called Lot A. Thus the restrictions imposed in the conveyance to the corporation could not affect any of the lots on the west side of Dundalk Avenue in the blocks between Baltimore Avenue and Ventnor Terrace, since all either had been previously conveyed, without building restrictions, by the company's predecessor in title, or were held without building restrictions by the company. It was not until the Dundalk Corporation, by its deed of March 30th, 1922, conveyed Lots Nos. 13 and 14 to the Trustees of St. Helena Lodge No. 171 I. O. O. F., their successors and assigns, in fee, that any building restriction was imposed upon any of the several lots fronting on the west side of Dundalk Avenue, between Ventnor Terrace and Baltimore Avenue. In this deed poll the lots are described merely by reference to their numbers on the plat of the Sparks land, and the provisions with respect to the restrictions are found in the habendum and tenendum, which reads: "To have and to hold the said lot of ground unto and to the use of the said Trustees of Helena Lodge, No. 171, I. O. O. F., their successors and assigns, in fee simple, subject to the following conditions and restrictions, and to have the same effect as if signed by the said party of the second part." The restrictions imposed are five in number, and the first four relate to the use of the premises and to the reservation to the grantor, its successors and assigns, of every interest and estate of the grantor in the various ways and easements

appurtenant to the premises granted. The first restriction is the one with which this appeal is concerned, and it is of this form: "First: That no part of any buildings erected or kept on said land shall be within seventeen (17) feet of Dundalk Avenue."

The grantee did not sign the deed, nor did the instrument contain any express term or stipulation whereby the grantee agreed for itself, its successors and assigns, to be bound by the restrictions last quoted. Nor does the grantor undertake for itself and its successors and assigns that the small triangular Lot A, which is the only remaining parcel of land owned by the grantor between Ventnor Terrace and Baltimore Avenue, and any other of its lots forming any part of the development, shall be subject to this building restriction.

From the time of the purchase of the Sparks land in 1917 until the conveyance in 1922, and for some years after, the division of Dundalk Avenue which was west of the private right of way of the railway and between Ventnor Terrace and Baltimore Avenue was a country dirt road; and not one of the lots which fronted on Dundalk Avenue, within the area specified, was then improved. It was not until 1929-30 that buildings began to be erected. At the present time all these lots are occupied by structures for various business purposes, except Lots Nos. 13 and 14 and the triangular piece here called A. None of the buildings thus erected are set seventeen feet back from Dundalk Avenue, nor do they conform to any other distance.

The lots purchased by the Lodge became by mesne conveyances the property of the complainants, who had notice of the provisions of the deed of the Dundalk Company to the Lodge, since not only that deed is of record, but the later deeds in their chain of title are of record and refer either directly to the provisions or to the original deed. *Lowes v. Carter* 124 Md. 678, 93 A. 216.

The Lots Nos. 13 and 14 are unimproved, but the plaintiffs proposed to erect upon them a large building for commercial use with the front of the building in coin-

cidence with the prevailing building line as determined by the structures erected to the north and south of their premises. As the building line which has been followed is not seventeen feet back from Dundalk Avenue, the plaintiffs were informed that the front projection of their proposed building must not come within this distance of seventeen feet. The position taken by the Dundalk Company would require the plaintiffs to keep, to their disadvantage, their building back of the front line of the others, and to sustain a loss in floor space of serious proportions. Accordingly, the plaintiffs have brought this suit under the Declaratory Judgment Act (article 31A of Code; Acts of 1939, ch. 294) in order that their rights and obligations with respect to the provisions of the grant under which they derive their title may be considered and determined.

The principles and rules of law which will determine the rights and obligations of the parties with reference to the instruments of title and the given facts and circumstances of the present record have been declared by numerous decisions. An agreement by the grantee not to build upon specified land within a certain distance of a specified object or line is a restriction upon the use of land which equity, under prescribed circumstances, will enforce against the grantee's transferee who takes either with notice of the agreement, or without notice but for no valuable consideration. The question is not whether the agreement runs with the land, but whether a party who either takes title with notice or for no valuable consideration shall be permitted to use the land in a manner inconsistent with the contract entered into by his grantor. *Tulk v. Moxhay*, 2 Phil. 774; *Tiffany on Real Property*, (2nd Ed.), secs. 394, 395.

So, where the owner of land agrees with the buyer of a part of it that the latter shall either use or abstain from using the land purchased in a particular way, the contract may be specifically enforced between the vendor and vendee, since neither party to the agreement may equitably be permitted to use the land in a manner incon-

sistent with the contract. Thus the question is fundamentally whether the contract as to the use of the land is enforceable in equity between the parties. If such an equity is attached to the land by the owner, no subsequent purchaser with notice, nor one who takes the land without giving value, can stand, in equity, in a different situation from the party from whom he bought. *Wolfe v. Frost,* 4 Sandf. Ch. 72, 88. Under such circumstances, the equity which is attached to the property is not detached by the transmission of title. *Thruston v. Minke,* 32 Md. 487, 493; *Lynn v. Mount Savage Iron Co.,* 34 Md. 603, 638; *Halle v. Newbold,* 69 Md. 265, 269-272, 14 A. 662; *Newbold v. Peabody Heights Co.,* 70 Md. 493, 501, 17 A. 372; *Peabody Heights Co. v. Willson,* 82 Md. 186, 198-201, 32 A. 386, 1077; *Wood v. Stehrer,* 119 Md. 143, 86 A. 128; *Foreman v. Sadler's Executors,* 114 Md. 574, 80 A. 298; *Ross v. McGee,* 98 Md. 389, 56 A. 1128.

The equitable obligation, therefore, binds the promisor and his assignee not personally but in respect of his present ownership of the land. Thus the equitable obligation imposed ceases with the termination of the ownership of the land, because the restrictive agreement contemplates acts or restraints of the owner of the land. So, if a decree for specific performance be awarded, it must be against the instant owner of the land. It follows that it is essential to the existence of the restriction upon the use or dominion of land (a) that there shall be a contract with reference to the use of the land; (b) that, at the time of the agreement which creates the restriction, the intention of the parties shall be that it run with the land; and (c) that the contract be one which equity will specifically enforce.

1. The first requirement for the creation of a restriction in the use and enjoyment of land, that there must be a binding contract, is gratified by the contract implied from the acceptance of a deed containing a stipulation by words of reservation, provision, or condition. *Vogeler v. Alwyn Improvement Corp.,* 247 N. Y. 131, 159 N. E. 886, 887; *Washburn's Easements and Servitudes* (4th

Ed.), sec. 3 pp. 114, 115; *Jones on Easements,* sec. 108. See *Dawson v. Western Md. R. Co.,* 107 Md. 70, 68 A. 301.

2. The second requirement, that the parties intended their agreement not to be the personal obligation of the promisor, but the imposition of a restriction upon the use or enjoyment of a particular piece of land, owned by one party, for the benefit of another parcel of adjoining or adjacent land owned by the other party, is sufficiently met where the grantor, by the language of the deed or lease, imposes a restriction, in the nature of a servitude or easement, upon the land he sells or leases for the benefit of the land he still retains; and indicates that the restriction is to run with the land conveyed and retained, after transfer, by providing that, while owned by the heirs and assigns, respectively, of the grantor and grantee, the restrictions shall continue in effect. *Lowes v. Carter,* 124 Md. 678, 93 A. 216; *Meade v. Dennistone,* 173 Md. 295, 297, 303, 304, 196 A. 330; *Ferguson v. Beth-Mary Steel Corp.,* 166 Md. 666, 667-674; *Fitzsimmons v. South Realty Corp.,* 162 Md. 108, 159 A. 111; *Bealmear v. Tippett,* 145 Md. 568, 571, 125 A. 806; *Beetem v. Garrison,* 129 Md. 664, 673, 99 A. 897; *Ringgold v. Denhardt,* 136 Md. 136, 110 A. 321. The restriction likewise runs with the land even if the words of the instrument itself do not show the intention of the parties, as where the intention is found in the laying out in alleys, streets and lots of land by its owner pursuant to a general plan of development; and restrictions are created for the common benefit of the owner of the tract and his heirs and assigns, and the purchasers of the several lots so laid out and their respective heirs and assigns. *Peabody Heights Co. v. Willson,* 82 Md. 186, 198, 32 A. 386; *Newbold v. Peabody Heights Co.,* 70 Md. 493; *Sowers v. Holy Nativity Church,* 149 Md. 434, 131 A. 785; *Boyd v. Park Realty Corp.,* 137 Md. 36, 41, 111 A. 129.

In the deed containing the restrictions in the pending appeal, there is no terminology providing that the two lots conveyed by the Dundalk Company to the Lodge are

subject to the restriction in building after the original grantee and promisor had conveyed the land to a third party. Nor were these lots subject to any building restrictions by reason of being a part of a common plan of development. The Dundalk Company, however, is not thereby precluded from otherwise showing by competent testimony the intention of the parties to create a restrictive agreement for the benefit of the land owned by it.

In the determination of the question at issue here, effect is to be given to the intention of the parties at the time of the agreement, as found in the language of the instrument, when considered in connection with the object in view of the parties and the circumstances and conditions affecting the parties and the property, but, since the law does not favor the encumbrance of property by enduring restrictions in its use and enjoyment, a strict construction of the terms used is the rule, and all doubt is resolved in favor of the free and full enjoyment of property. *McKenrick v. Savings Bank,* 174 Md. 118, 128, 197 A. 580; *Legum v. Carlin,* 168 Md. 191, 193, 194, 177 A. 287; *Ferguson v. Beth-Mary Steel Corp.,* 166 Md. 666, 672, 673, 172 A. 238; *Sowers v. Holy Nativity Church,* 149 Md. 434, 442, 131 A. 785; *Smith v. Government Realty Co.,* 172 Md. 547, 551, 192 A. 341; *Himmel v. Hendler,* 161 Md. 181, 187, 188, 155 A. 316; *Bealmear v. Tippett,* 145 Md. 568, 571-573, 125 A. 806; *Ringgold v. Denhardt,* 136 Md. 136, 145, 110 A. 321; *Newbold v. Peabody Heights Co.,* 70 Md. 493, 17 A. 372; *Peabody Heights Co. v. Willson,* 82 Md. 186, 32 A. 386, 1077; *Foreman v. Sadler's Executors,* 114 Md. 574, 579, 80 A. 298; *Williams Realty Company v. Robey,* 175 Md. 532, 539, 2 A. 2nd 683; *Clem v. Valentine,* 155 Md. 19, 27, 141 A. 710.

By the deed of the unimproved lots, Nos. 13 and 14, to the Lodge in 1922, the Dundalk Company was left with but one small triangular piece of land on the country dirt road designated as west side of Dundalk Avenue. This small parcel was in the acute angle formed by the converging lines of Dundalk Avenue and an unnamed avenue

which was the first one laid out to the west of Dundalk Avenue. The apex of the triangle is in the southern boundary line of Ventnor Terrace. Its base is 12 feet, its altitude is 43 feet and its hypothenuse, which is in the line of the west side of Dundalk Avenue, is 45 feet. The area of this bit of land is estimated to be 270 square feet, and it was the single piece of land of which the Dundalk Company was the owner in the three blocks of lots between St. Helena Avenue to the north and Baltimore Avenue to the south. Except for this triangle, the company owned no land nearer to Lots Nos. 13 and 14 than 600 feet, whether measured north or south along Dundalk Avenue. The shortest distance along Dundalk Avenue from the nearest point of these lots to the base of the triangle is 265 feet, which includes the width of an alley (10 feet) ; the front (129 feet) of Lot No. 35, the width (50 feet) of Patapsco Avenue, and the width (76 feet) of Lots Nos. 16 and 15. In this distance of 265 feet the Dundalk Company owned no land, and there were no building restrictions on any of the lots fronting on Dundalk Avenue. It follows that the restriction imposed against the erection of any building on Lots Nos. 13 and 14 within the distance of seventeen feet of Dundalk Avenue could not benefit the distant triangular parcel of land of an area of 270 square feet. It neither affected in the slightest degree this parcel of the company. The distance back of the street line of the buildings which might be erected on Lots Nos. 13 and 14 could neither impair nor assure the enjoyment of the triangle in access, egress, light, air or its residential or commercial utility. Nor would the restriction, at such a distance, affect the prospect, nor be of any benefit in that respect, since there was no building restriction on the independently owned and controlled intervening lots, and any imaginable benefit of the restriction on Lots Nos. 13 and 14 would at once be destroyed by any structure on or near the building line of the intervening unrestricted lots. In fact, it is difficult to ascribe any weight to a contention that this isolated fragment of land was an object of consideration

650

in the transaction. Much less is there ground for the inference that the parties intended that the owner of this fragment could enforce, for its benefit, against the land of Lots Nos. 13 and 14 in the hands of the assignees of the grantee the building restriction mentioned. The land of the company 600 feet to the north and south of Lots Nos. 13 and 14, and not within the three blocks of lots between Baltimore Avenue and Saint Helena Avenue nor of any development in 1922, is not contiguous, adjacent, or neighboring land to be accepted as the land of the owner which was intended by the parties to be benefited by the building restriction imposed on Lots Nos. 13 and 14.

In addition to the facts stated, it appears from the record that the western section of Dundalk Avenue between Baltimore Avenue and Ventnor Terrace is twenty-five feet wide, and that the title to this portion of the road-bed is in the Dundalk Company. At Ventnor Terrace and unnamed street, which is thirty feet in width, enters Dundalk Avenue on an acute angle, and, from that point northward, the west side of Dundalk Avenue is forty feet in width. South of Baltimore Avenue the west side of Dundalk Avenue widens to thirty feet for a distance of about 300 feet, and then widens again to not less than forty feet for 800 feet where the road ends.

When the company acquired its title in 1917, and conveyed Lots Nos. 13 and 14 in 1922, Dundalk Avenue was a dirt country road, twenty-five feet wide. The title to its road bed between Baltimore Avenue and Ventnor Terrace was in the Dundalk Company, subject to the easement of a public highway. It was on this roadway that Lots Nos. 13 and 14 faced, and, when they were conveyed in 1922, the company reserved its rights and interest in the roadbed of this avenue. This fact is appropriated in support of the contention that the restriction imposed was for the benefit of the remote and unconnected property of the company, in that an increase in the widening of the public way between Baltimore Avenue and Ventnor Terrace would be beneficial in afford-

ing increased facilities for public travel to, through, and from the company's property to the north and south of the highways last mentioned; and that this widening by the public would be more likely to occur if there were no buildings on Lots Nos. 13 and 14 within seventeen feet of the existing highway.

Any widening of the public way would include the triangular parcel or so much of it as to destroy its value, so an increase in width of the highway would not be a benefit to this land of the company. The cost of its acquisition by the public for the widened way would not be a benefit to the land, *qua* land, but remuneration to its owner for its appropriation to the public use. The existing width of the public way is sufficient for two lanes of travel, and any enlargement in width would be an advantage common to the public generally and of no particular and special benefit to the land of the company to the north and south of the blocks of lots between Ventnor Terrace and Baltimore Avenue and west of Dundalk Avenue.

The facts and circumstances have been fully stated with particular relation to the time when the deed containing the restrictions was executed. It is pertinent to add that the west section of Dundalk Avenue was a dirt road until about 1930, when Baltimore County assumed its exclusive care and maintenance. It was then that the original roadway was transformed by putting in concrete curbs and gutters along the paving line and the right of way of the railway company, and building a macadam roadway between the curbs. The width of the avenue for vehicular travel is nineteen feet between the inside lines of the curbs, which leaves a width of five feet of the original bed of the avenue for a sidewalk, whose width has been increased, by the addition of adjoining lot owners, to ten feet in front of the block in which Nos. 13 and 14 are located. Dundalk Avenue on the east side was originally laid out for a width of forty feet and the driveway was nineteen feet wide. The road was paved about 1927, and the driveway then widened

to twenty-four feet. Thus it would seem that the widening of the west side is quite a remote contingency. However, the possible use of the intervening space of seventeen feet between the present western boundary line of Dundalk Avenue for the purpose of widening that highway depends upon a public necessity for that action as primarily determined by the State or her authorized public authority. Thus the involuntary taking of land for a public use is in origin extrinsic to any agreement of the land owner and his grantee with reference to any restrictions in relation to the occupancy of the land by the grantee. Hence, in the complete absence of any design on the part of the public thus to widen the avenue, the restriction against the projection of a building beyond seventeen feet back of the street line could not, in the absence of some clear expression of intention to the contrary by the contracting parties, be assumed to have been made in contemplation of that action by the public. See *London County Council v. Allen,* L. R. [1914], 3 K. B. 642. On the facts of this record, the court cannot assume an intention which is not expressed. *Ringgold v. Denhardt,* 136 Md. 136, 150, 110 A. 321; *Booth v. Knipe,* 225 N. Y. 390, 122 N. E. 202; *Donohoe v. Turner,* 204 Mass. 274, 90 N. E. 549; *Jennings v. Baroff,* 1929, 104 N. J. Eq. 132, 144 A. 717, 719; *Klein v. Sisters of Charity,* 1927, 101 N. J. Eq. 761, 139 A. 174, 177.

It follows from what has been said that the building restriction was the personal obligation of the Lodge for the benefit of the Dundalk Company, the grantor, and enforceable in equity by the grantor against its immediate grantee. Since the restrictive agreement is the personal obligation of the grantee, and, so, does not run with the land in equity, the agreement cannot be enforced against the assignees of the original grantee.

3. A valid agreement that the use of the land conveyed shall be so restricted that no building shall be erected thereon within a specified number of feet from a definite line or object is susceptible of specific performance by the equitable remedy of an injunction to restrain

the forbidden encroachment, or a mandatory injunction to undo what has been done in violation of the agreement.

The fact that equity may enforce the restriction does not necessarily involve a decree for specific performance. Equitable relief is subordinate to the general principles upon which equity proceeds. The court is not here concerned with questions arising under this head.

For the reasons assigned, the decree of the chancellor must be reversed, and the cause remanded for a declaratory decree in conformity with the conclusions reached by this court.

> *Decree reversed, and cause remanded for a declaratory decree in accordance with this opinion, with the costs to be paid by the appellee.*