STEUART TRANSPORTATION COMPANY ET AL. *v.*
ASHE ET AL.

[No. 250, September Term, 1972.]

*Decided May 17, 1973.*

The cause was argued before MURPHY, C. J., and BARNES, McWILLIAMS, SINGLEY, SMITH, DIGGES and LEVINE, JJ.

*Joseph W. Kiernan,* with whom were *Robert V. Smith* and *Smith, Ristig & Smith* and *Charles A. Norris* on the brief, for appellants.

*Bennett Crain, Jr.,* with whom were *Stanley E. Hartman* and *Hartman & Crain* on the brief, for appellees.

BARNES, J., delivered the opinion of the Court.

The principal question in this appeal is whether the Circuit Court for St. Mary's County, in Equity (Mitchell, J.), was clearly in error for permanently enjoining the appellants, Steuart Transportation Company and Steuart Investment Company, from mooring oil barges against the pier in front of their property in Piney Point, Maryland, and from constructing a pier from any part of their property for commercial or industrial uses. Steuart Investment Company is the owner of Lots Nos. 2, 3 and 4 in "Warren Tolson's Subdivision No. 2" in Piney Point, Maryland. Steuart

Transportation Company is in the business of transporting fuel oil and moors its oil barges to the pier in front of the property.

The primary basis for the lower court's decree of July 11, 1972, was that Lots Nos. 2, 3 and 4 and the riparian rights incident thereto were subject to restrictions resulting from a uniform general plan of development of Piney Point, which limited the use of the pier to crabbing, noncommercial fishing, bathing and the mooring of family boats or launches. The court held that these restrictions prohibited the defendants from using the pier for commercial and industrial purposes and, further, from constructing a pier for such purposes. We have concluded that the chancellor was not clearly in error in his findings and conclusions and we will affirm the decree of July 11, 1972.

Piney Point, located in St. Mary's County, is a 151-acre, hook-shaped peninsula which points south and juts out into the Potomac River, approximately midway between Washington, D. C. and Norfolk, Virginia. The St. Mary's River empties into the Potomac River on the east side of the point. A lighthouse is maintained by the United States Coast Guard on the point. Back in 1905, Warren J. Tolson and his wife, Annie H. Tolson, bought Piney Point which was improved by a 25-room hotel, 27 cottages, other buildings and a steamboat wharf. Between the hotel and the river, a 100-foot wide beach stretched northward for the entire length of the property. At that time, the place was primarily a summer resort; the hotel was in operation; the cottages were fully used; and the steamboat brought passengers from all over.

Mr. and Mrs. Tolson lived at Piney Point after they acquired the property in 1905 and their heirs still retain title to the hotel site. However, time has left its mark on the property. The hotel had not been in operation since 1943 when it was used as apartments for a naval installation during World War II. In 1954, shortly after Mr. Tolson died, "Hurricane Hazel" blew off the roof of the hotel. The roof was not replaced and the hotel is in a state of complete disrepair.

With this background in mind, we now turn to the

development activities of Warren Tolson in connection with Piney Point. These activities were first evidenced on August 23, 1909, when he recorded a plat designated as "Tolson's Subdivision" among the Land Records of St. Mary's County in Liber EBA No. 8, folio 49. This original subdivision is located to the northeast of Tolson's Hotel and consists of 58 lots, each 40 feet wide, fronting on what the plat designates as "Maindrive way," running parallel to the Potomac River along the beach and covered with sand. The rear of those lots is upon Piney Point Creek, the lots being located upon the relatively narrow portion of the Piney Point Peninsula bounded generally by the Potomac River on the south and by Piney Point Creek to the north. A few months later — on December 17, 1909 — Mr. Tolson recorded among the Land Records in Liber EBA, folio 49 a sealed instrument, executed and acknowledged by him and his wife (Document #1) in regard to the original subdivision. In the grantor index, the following appears: "Dec 13/ 1909/ Tolson / Warren et ux/ Plat & Agreement Piney Point Hotel Prop./ E.B.A./ 8/ 49."

Document #1 is as follows:

"With the intent that this instrument may be recorded upon the following referred to plat,

"Know all men by these presents, that we, Warren Tolson and Annie H. Tolson, his wife, do hereby dedicate so much of the land on the plat called Warren Tolson's Subdivision of a part of Piney Point, as recorded Aug. 23 — 1909 in Liber E.B.A. No. 8, folio 49, one of the land records of Saint Mary's County marked thereon as 'Beach' which is bounded on the North by the Main driveway, on the east by a line drawn N. 14°W. from point No. 43 on the outline survey of the whole tract to said Roadway, on the South by low water mark of the Potomac River, and on the west by the extension of the west line of lot number one to said low water mark, to use and enjoyment in common by any of the owners of said lots from 1 to 58 both inclusive, as a common parkage, with the privilege in any lot owner, his heirs or assigns, to erect on

said parkage within the area thereof ascertained by extending the east and west lines of the lot owned by the person so desiring to build to low water mark on said River, a family bath house, a summer house, not nearer than 20 ft. to said Roadway and with the right to construct a small wharf into the water opposite his, her or their lot or lots for crabbing, bathing and the use of family boats or launches. No structure of any kind shall be built upon said parkage, nor boat wharves for Steamboats into the river. Nor shall any public fishing or oyster shore usage be made of said river front. The said Warren Tolson reserves the right for himself his heirs and assigns to use said parkage as such in common with the owners of said Lots 1 to 58 for the use of sojourners at the Piney Point Hotel property not subdivided.

"In witness whereof the said Warren Tolson and Annie H., his wife have hereunto set their hands and seals this 13th day of December, 1909.

Warren Tolson [Seal]<br>
Annie H. Tolson [Seal]

"Test:
John L. Fletcher

"I hereby certify that on this 13th day of December Nineteen hundred and nine before me, the subscriber, a Notary public in and for the District of Columbia personally appeared Warren Tolson and Annie H. Tolson his wife and acknowledged the aforegoing instrument of writing to be their act and deed.

"[N.P.
Seal]

John L. Fletcher,<br>
Notary Public, D. C.

"Received this 17th day of December, 1909 at 10 o'clock A.M. for record and examined per me."

The second venture into the development of the Piney Point land occurred on November 20, 1923, when Mr. Tolson recorded a plat designated as "Warren Tolson's Subdivision No. 2 in Piney Point" among the Land Records of St. Mary's County in Liber J.M.N. No. 2, folios 83 and 84. Subdivision No. 2 is located to the south of the Tolson Hotel along the shore of the Potomac River and consists of 12 lots. Like the original subdivision to the northeast, 11 of the 12 lots are 40 feet wide. All of the lots are 175 feet deep. Lot No. 1 is trapezoidal in shape and has a larger area than the other lots. Also these lots front on a 50-foot wide strip running parallel to the Potomac River along the beach and corresponds to "Maindrive way" on Document #1, but is not so designated on the plat to Subdivision No. 2. The Court has adapted this plat by reducing its scale from 1 inch equals 50 feet to 1 inch equals approximately 100 feet and has eliminated the metes and bounds description of the surveyor on the plat as well as the recordation notations of the clerk. This adapted plat is included as an Appendix to this opinion.

Simultaneously with the filing of the plat of Subdivision No. 2, Mr. Tolson filed a written instrument (Document #2), the provisions of which are as follows:

"With the intent that this instrument may be recorded upon the following reference to the plat.

"Know all men by these presents, that we, Warren Tolson and Annie H. Tolson, his wife, of St. Mary's County, State of Maryland, do dedicate so much of the land on the plat called 'Warren Tolson's Subdivision No. 2 in Piney Point,' St. Mary's County, Maryland, marked thereon as 'Beach' which is bounded on the North by the main walkway on the East by a line drawn from the point F. on the plat to low water mark on the Potomac River, on the south by the Potomac River, and on the West by an extension of the West line of lot number one to said low water mark, to the use and enjoyment in common by any of the owners of said lots one to twelve, both inclusive, as a common parkage within the area thereof ascertained by

extending the east and west lines of the lots owned by the persons so desiring to build to low water mark on the said Potomac River a family bath house or summer house within said area and with the right to construct a small wharf into the water opposite his, her or their lot or lots for crabbing, bathing and the use of family boats or launches. No structure of any kind shall be built upon parkage, nor boat wharves for steamboats into the river, nor shall any public fishing or oystering rights for himself, his heirs or assigns obtain said parkage to be used in common with the owners of said lots one to twelve, both inclusive, and for the sojourners at Piney Point Hotel Property, not subdivided.

"In witness whereof said Warren Tolson and Annie H. Tolson, his wife, have set their hands and seals this 10th day of November, 1923.

Warren Tolson [Seal]<br>Annie H. Tolson [Seal]

"Test

    B. Kennedy Abell

"State of Maryland, Saint Mary's County, to wit:

"On the 10th day of November, in the year nineteen hundred and twenty three, personally appeared before me, the subscriber, a Notary Public of the State of Maryland, in and for St. Mary's County, Warren Tolson and Annie H. Tolson and acknowledged the aforegoing deed to be their act.

"Witness my hand and Notarial Seal this 10th day of November, 1923.

"[N.P.
Seal]

B. Kennedy Abell,<br>Notary Public"

The grantor index shows the following:

"Nov 10/1923/Tolson/Warren et ux/to/Dedicate Roadway /Deed/J M M /2/83

" " / " / do / do / " /Subdivision No 2 Piney Point/Plat/ " /"/84 "

On the same day the plat for Subdivision No. 2 and Document #2 were recorded, Mr. and Mrs. Tolson executed the first deed out of Subdivision No. 2 for Lot No. 12 to Helen J. and Gertrude E. Bury as joint tenants. This deed was recorded among the Land Records of St. Mary's County on January 5, 1924, in Liber J.M.M. No. 2, folio 212. In the grantor index, the recordation of this deed is separated from the recordation of the plat for Subdivision No. 2 by one deed from Warren S. Thompson, dated December 3, 1923, and recorded in Liber J.M.M. No. 2, folio 99.

The deed to the Burys of Lot 12 provided in relevant part:

The Tolsons granted to the Burys: —
*"their heirs and assigns* the right to use *in common with the owners of lots 1 to 12, both inclusive in said subdivision the strip* lying between said main walkway and low water mark on the Potomac River for a *beach or parkage,* and with the *right to erect and maintain a bath house for themselves and families and a summer house, also a wharf into the river for fishing, crabbing, bathing and the use of family launches.*

"And the parties of the first part do further grant and convey, unto the parties of the second part, *their heirs and assigns* all the rights and privileges set forth in a paper writing known as a *Dedicatory Supplement to a plat* recorded in *Liber J.M.M. No. 2,* folio — one of the Land Records of St. Mary's County, Maryland.

"And the parties of the first part do further grant unto the parties of the second part, *their heirs and assigns* the privilege of using the steamboat wharf at Piney Point so long as said wharf is controlled by the parties of the first part, *their heirs* for the purpose of travelling or steamboat stopping at said wharf and with the right to land freight and baggage thereon." (Emphasis supplied)

After the habendum clause, there follow the usual covenants of special warranty and further assurance,[1] the signatures and seals of the Tolsons and a proper acknowledgement of the deed by them.

The second conveyance out from the Tolsons was for Lot No. 1 to Myrtle J. Tolson, by a deed dated January 5, 1925, and recorded among the Land Records of St. Mary's County in Liber J.M.M. No. 3, folio 128. It is virtually identical with the Bury deed.

The third conveyance out from the Tolsons in Subdivision No. 2 was by a deed dated April 11, 1925, to Lots 9 and 10 to William Boyd, and recorded among the Land Records of St. Mary's County on April 30, 1925, in Liber J.M.M. No. 3, folio 95.

The Boyd deed, in relevant part, after granting the land to Boyd, "his heirs and assigns, in fee simple," provides:

"Lots Nine (9) and Ten (10) in Warren Tolson's subdivision Number Two (2), Piney Point, St. Mary's County, State of Maryland, as per plat recorded in Book J.M.M. #1 [*sic* #2?] at folio 84, one of the land records of said county, together with a *right of way over the property of the grantor East of said subdivision for access* to said lots by suitable roadway to the rear thereof; also a *right of way* over said property of the grantor to and over a strip of land *fifty feet (50') in width, paralleling the front line of said lot lines,* which said fifty foot strip shown on said plat, shall be *reserved for the perpetual use of all the owners of lots in said subdivision No. 2;* also the parties of the first part further grant and convey to the party of the second part, in *fee simple,* all the *land lying between said fifty foot strip and the low*

---

1. Also following the habendum clause is a restriction against sale to "any person having negro blood in his veins, commonly known as colored people . . . ." Our predecessors indicated in 1938 in Meade v. Dennistone, 173 Md. 295, 305, 196 A. 330, 335 and again in 1945 in Scholtes v. McColgan, 184 Md. 480, 487, 41 A. 2d 479, 482-83, that a similar restriction in regard to the *sale* of land was invalid as an unreasonable restraint on alienation.

> *water mark on the Potomac River between a*
> *prolongation of the East line of said lot ten (10) and*
> *the west line of said lot Nine (9)."*

(Emphasis supplied.)

Then follow the "together" clause, the habendum clause, and covenants of special warranty, seisin, right to convey, quiet enjoyment, against encumbrances and further assurances. The Tolsons duly signed, sealed and acknowledged this deed.

On March 30, 1926, Lot No. 4 was conveyed by the Tolsons to George L. Edmunds by a deed identical — except for the number of the lot and its description — to the Boyd deed. In all other conveyances of lots in Subdivision No. 2, there was a conveyance of the fee simple estate with no reference to the plat, the supplement or to the restrictions.

Subdivision No. 2 was a successful development. All of the lots were sold. Houses were built on all but one lot and a number of pavilions and small piers were built. A family atmosphere still exists, modified only by the appellants' commercial activities.

Steuart Investment Company acquired Lots 3 and 4 and the fee simple estate in the beach in front of those lots by a special warranty, fee simple deed, dated February 23, 1961, and duly recorded from Cornice O. Tinsley and wife. The title examination, preparation of the deed, the settlement and delivery of the deed and certificate of title were handled by William Aleck Loker of the law firm of Loker, Wigginton and Loker of Leonardtown. Mr. Loker — called by the plaintiffs below — testified that he had represented Steuart Investment Company for a number of years "ever since" the Steuart interests "first started in business in St. Mary's." He estimated that either he or members of his law firm had worked upon 25 matters for the Steuart interests. Counsel for the plaintiffs and appellees exhibited to Mr. Loker Document #2 and he was asked:

> "Q. . . . Have you seen the original of that document when you examined the land records of — in the Tinsly [*sic*] transaction for Steuart Investment?"

* * *

"THE WITNESS: I have not seen the original . . . but I have seen this, a copy of this, written in hand in the land records of St. Mary's County."

* * *

"Q. When did you first see it? To your recollection? A. I couldn't state but I am sure that I saw it . . ."

* * *

"THE WITNESS: I know that I saw it prior to the conveyance from Tinsly [sic] to Steuart but when I first saw it I wouldn't be able to tell you. It might have been many years prior to that. But I did see it recorded the recorded instrument and I had a reference here somewhere, I think it is in JMM 2 at either page 83 or 84.

"It is one page ahead of the plat of the subdivision in the same book."

There was no other testimony in regard to Mr. Loker's knowledge of Document #2.

The Certificate of Title for Lot No. 2 does not mention the plat to Subdivision No. 2 nor Document #2. William R. Saul, President of the Steuart Transportation Company, testified that neither Mr. Loker nor Mr. Wigginton had ever told him that there were any covenants or restrictions on any of the properties. He stated:

"We had absolutely no knowledge of any restrictions. My first knowledge, I believe, was when [counsel for the appellees] told me in Annapolis."

Steuart Transportation Company acquired Lot No. 2 on March 30, 1964, from Lloyd Prather and wife (original grantees from the Tolsons). This lot was improved by a cottage and small pier. The Steuart Transportation Company transferred this lot to the Steuart Investment Company by a deed dated March 10, 1969. Both deeds were

duly recorded and neither refers to Document #2 nor to any restrictions applicable to Lot No. 2.

The plaintiffs below and appellees here all acquired their respective lots in Subdivision No. 2 in the period between 1946 and 1966 from the original grantees of the Tolsons. None of these subsequent deeds contained any restrictions, reference to restrictions, or references to Document #2. None of the parties had knowledge of the restrictions or Document #2 at the time of the purchase. However, in all of the deeds by which the plaintiffs acquired their respective properties the number of the lots in the plat of Subdivision No. 2 was given and a reference to the plat among the land records was given.

In 1926, Mr. Tolson recorded two plats of additional subdivisions of Piney Point. "Tolson's Subdivision No. 3 of Piney Point" contained 12 lots each with a 40-foot frontage, except Lot No. 1 (with a frontage on Lighthouse Road of 20 feet), and a lot 20 feet by 175 feet called "Laf-a-Lot" across Lighthouse Road immediately east of, and paralleled to, Lot No. 12 in Subdivision No. 2. Subdivision No. 3 is directly northeast of Subdivision No. 2, being separated from it by Lighthouse Road, State Route 498. Eleven of the 12 lots run to the south side of Piney Point Creek. Subdivision No. 3 (except the Laf-a-Lot property) was purchased by the United States Government in 1940 and sold to Steuart Investment Company in 1970. The company's office building is now located on this property.

In 1926, Mr. Tolson also filed for record a plat of "Tolson's Subdivision No. 4 of Piney Point," surveyed on February 3, 1926, and recorded among the Land Records of St. Mary's County in Liber J.M.M. No. 3, folio 503. It consisted of 38 lots on the Potomac River, 50 feet wide "around the horn" from Subdivision No. 2 immediately northwest from the Coast Guard lighthouse property.

It was stipulated in the lower court by the parties that there were no instruments filed at or about the time of the filing of the plats for either Subdivision No. 3 or Subdivision No. 4 comparable to Documents #1 and #2.

On December 9, 1949, Mr. Tolson leased to Steuart

Brothers, Inc. (the predecessor corporation to Steuart Investment Company) a tract of land which encompassed the Subdivision No. 4 lots. This lease contained an option to purchase, which the lessee exercised, receiving title from the heirs of Warren Tolson on December 30, 1958. The Steuart main pier was constructed into the Potomac River from the first three or four lots in Subdivision No. 4 in 1950. This main pier accommodates seagoing tankers, principally from Venezuela, which unload fuel oil into the pipelines on the pier which carry the fuel oil to a tank farm at Piney Point, operated by Steuart Petroleum Company, an affiliate of Steuart Investment Company. It is also from this main pier that the oil barges of Steuart Transportation Company are loaded for transport to Washington, D. C., Richmond and Norfolk, Virginia, and other ports of call.

During the course of construction of the main pier, vessels frequently tied up in front of Lot No. 2 in accordance with an agreement between Mr. Prather and Steuart Petroleum Company, negotiated by Mr. Saul, prior to the acquisition of the Prather property (Lot No. 2) in 1964 by the Steuart Investment Company.

From 1956 until 1964, the barges only made periodic movements from Piney Point, coming in and loading only under normal conditions; but in heavy wind and ice, the barges were anchored in the harbor in front of Subdivision No. 2. Although the company started in 1956 with only two barges, it has since grown and at the time of trial owned 10 or 11 barges operating on a regular basis.

In 1964, Steuart Investment Company applied for and obtained from the United States Army Corps of Engineers a permit to construct (and in 1964 did construct) two mooring dolphins, one at the Prather pier itself and the other approximately 150 feet out in the Potomac River directly in line with the Prather pier. The Prather pier has been used for the "parking" of empty barges when not in use, when awaiting space at the main pier for loading or when seeking protection from a northwest storm. This mooring of empty barges along side the Prather pier has been open and notorious. Mr. Saul, President of Steuart Transportation Company, testified that the operations in front of Sub-

division No. 2 were a 24-hour operation and one of the reasons for the purchase of Lot No. 2 (the Prather property) was to allow the barges to be tied up at any hour. He stated that other barge operators would sometimes pull their barges onto the beach in front of Subdivision No. 2 and "tie the bow of the barge up to a pine tree * * * — that would be their berth."

Mr. Ashe, one of the appellees, became aware in 1964 that barges were being moored to the Prather pier. He promptly objected to this to Hebb Pembroke, the operations manager, who, in turn, referred him to Mr. Saul. At a conference between Mr. Ashe and Mr. Saul, the latter told Mr. Ashe that the Steuart Transportation Company had a permit to put the barges there, that it was the company's property, and that was the reason for the purchase of the property. Mr. Ashe testified that he continued to call Steuart employees to "ask them for God sake to get those things out in front of my house and quit shining lights in the bedroom windows and ringing bells and spilling oil in front of me." Receiving no satisfaction, Mr. Ashe consulted counsel and authorized the filing of the bill of complaint in the present case.

As we have indicated, the chancellor filed a written opinion finding certain facts and concluding that the Tolsons had intended to create and establish a general plan of development of which the appellants as defendants below had notice. In his carefully considered opinion, the chancellor found that the general plan of development had not been abandoned and further that the applicable restrictions or equitable servitudes justified the enjoining of the construction of the proposed pier and the use of the existing pier for commercial or industrial use including, but not limited to, the mooring, loading or unloading of oil barges or vessels. We will comment more fully upon the chancellor's opinion later in this opinion.

1.

The decisions of this Court have set forth the law applicable to uniform general plans of development of land and the enforcement of restrictions on the use of the land,

subject to the uniform general plan. Judge Offutt, for the Court, in *McKenrick v. Savings Bank of Baltimore*, 174 Md. 118, 197 A. 580 (1938) comprehensively reviewed the prior Maryland cases on this subject, beginning with *Thruston v. Minke*, 32 Md. 487 (1870), and stated the Maryland law to be as follows:

> "These cases sufficiently establish as the law of this state these principles: That one owning a tract of land, in granting a part thereof, may validly impose upon the part granted restrictions upon the use thereof for the benefit of the part retained, and upon the part retained for the benefit of the part granted, or upon both for the benefit of both; that, where the covenants in the conveyance are not expressly for or on behalf of the grantor, his heirs and assigns, they are personal and will not run with the land, but that, if in such a case it appears that it was the intention of the grantors that the restrictions were part of a uniform general scheme or plan of development and use which should affect the land granted and the land retained alike, they may be enforced in equity; that covenants creating restrictions are to be construed strictly in favor of the freedom of the land, and against the person in whose favor they are made; and that the burden is upon one seeking to enforce such restrictions, where they are not specifically expressed in a deed, to show by clear and satisfactory proof that the common grantor intended that they should affect the land retained as a part of a uniform general scheme of development."
> 174 Md. at 128, 197 A. at 584-85.

Judge Offutt also stated in *McKenrick:*

> "The important point decided in *Lowes v. Carter*, 124 Md. 678, 93 A. 216, was that recordation of a deed subjecting land to restrictions afforded constructive notice thereof to all persons dealing with the property, and that such notice was sufficient to charge such persons with liability in

respect to the restrictive covenants."
174 Md. at 126, 197 A. at 584.

It was pointed out in *Scholtes v. McColgan,* 184 Md. 480, 489, 41 A. 2d 479, 483-84 (1945), *supra,* that the intention to establish a uniform scheme or plan of development with restrictions is a matter of intention of the parties. This intention may be "indicated in many ways" and the "whole question becomes a question of fact to be determined from all the circumstances in the case."

We cited *McKenrick* and *Scholtes* with approval in *Turner v. Brocato,* 206 Md. 336, 111 A. 2d 855 (1955) which, on several aspects of the present case, we consider to be determinative as later pointed out.

Inasmuch as the intention to establish a uniform scheme or plan of development is a question of fact, Maryland Rule 886 is applicable to the chancellor's findings of fact so that we will not set aside his decree "on the evidence unless clearly erroneous" and after giving due regard to the opportunity of the chancellor "to judge the credibility of the witnesses." Nor will we reverse the chancellor's conclusions from the facts found by him if within the provisions of the applicable law unless they are clearly in error.

In the present case, the chancellor found the following facts indicating an intention by the Tolsons to establish a uniform scheme or plan of development in the land included in Subdivision No. 2. First of all, the striking similarity between the method of development and the provisions applicable to Subdivision No. 1 and Subdivision No. 2 is significant as indicating an intention by the Tolsons, after Subdivision No. 1 developed into a reality, to continue the same type of uniform plan of development for Subdivision No. 2. Secondly, the effect of the plat and dedicatory supplement (Document #2) of Subdivision No. 2, when taken together, indicates a uniform general plan of development. The supplement described the restrictions and servitudes which the Tolsons intended to apply to Subdivision No. 2 and purchasers of the lots in that subdivision were bound by the restrictions if they purchased with notice of them. Thirdly, the uniform plan of

development became operative and an accomplished fact when the Bury deed of November 10, 1923 — the first conveyance out — was duly delivered and recorded. This deed sufficiently set out that the restrictions ran to and bound heirs and assigns and referred to the recorded plat for Subdivision No. 2 and Document #2. This was followed by the second conveyance of a lot from the subdivision by the deed to Myrtle Tolson of January 5, 1925, also setting out the restrictions and referring to the plat and Document #2. After the delivery of the Bury deed, the Tolsons "no longer had power unilaterally to remove the restrictions they had created." *Gnau v. Kinlein,* 217 Md. 43, 49, 141 A. 2d 492, 495 (1958). Fourthly, as we held in *Turner v. Brocato, supra,* the chancellor properly "looked not only to language in deeds, which gratified the requirements of the statute of frauds, but also to matters extrinsic — conduct, conversation and correspondence — to find and give effect in equity to the actual intent," 206 Md. at 346-47, 111 A. 2d at 861. The record indicates that when one looks at the land involved in both Subdivisions Nos. 1 and 2 — as the chancellor did with the consent of the parties — one observes that the plan as shown on the respective plats and supplements was actually carried out. Individual houses — some for summer use only, others for year-round use — were built on the lots. Summer houses or pavilions were built on the beach areas belonging to the respective lots and some small piers were built into the river. The only uses not compatible with the restrictions are those of the appellants.

As already noted, the appellants purchased their lots in Subdivision No. 2 by deeds from others than the original grantors and in which the restrictions are not set forth. They are, however, bound by the equitable servitudes in the beach area as we held in *Turner v. Brocato, supra,* where we stated:

> "It is established that the jurisdiction of equity to enforce certain rights in respect of land is not necessarily dependent upon technicalities which are so important at law, such as, does the covenant run with the land and the extent of the running of the benefits and burdens? Equity acts under the rule

laid down in *Tulk v. Moxhay*, 11 Beav. 571 (2 Phila. 774), where a covenant by the grantee of a piece of land to use it as a private square was enforced against a purchaser from the grantee with notice. The Lord Chancellor said the question was not ' * * * whether the covenant ran with the land, but whether a party shall be permitted to use the land in a manner inconsistent with the contract entered into by his vendor, and with notice of which he purchased.' His answer to the question was this: ' * * * If an equity is attached to the property by the owner, no one purchasing with notice of that equity can stand in a different situation from the party from whom he purchased.' This Court agreed with that answer in *Newbold v. Peabody Heights Co.*, 70 Md. 493, 502. Again, in *Levy v. Dundalk Co.*, 177 Md. 636, 646, Judge Parke said for the Court: 'Under such circumstances, the equity which is attached to the property is not detached by the transmission of title.'

"The decisions of this Court have long recognized that equity, under appropriate facts, will enforce what variously has been called reciprocal negative easements, implied equitable reciprocal servitudes or merely equities attached to land."
206 Md. at 346, 111 A. 2d at 860-61.

In our opinion, the chancellor properly ruled that the appellants had constructive notice of the restrictions applicable to the lots in Subdivision No. 2 by the recordation of the supplement, the plat and the Bury deed.

The appellants contend that Document #2 was not a paper which could properly be recorded. We disagree and find that Document #2 was properly recorded under the provisions of the then applicable statute and our construction of that statute.

When the supplement and the plat for Subdivision No. 2 were recorded, Chapter 47 of the Laws of 1865, then Art. 21,

§ 28 of the Maryland Code of 1912, was in effect.[2] It provided:

> "Every bond, writing obligatory or contract for the conveyance of real estate or any interest or estate of, in, or relating to real estate . . . may be executed, acknowledged and recorded in the same manner, as deeds of real estate. . . ."

Our predecessors gave a broad construction to this language to the end that all rights, incumbrances or conveyances, touching or in anywise concerning land, should appear on the public records. In *South Baltimore Harbor & Improvement Co. of Anne Arundel Co. v. Smith*, 85 Md. 537, 37 A. 27 (1897), involving the recordation and resulting constructive notice of a contract in regard to the purchase of lots and to certain rights in a proposed public square, Judge Fowler, for the Court, stated:

> "It was contended on the part of the plaintiffs that only deeds of conveyance and what are technically called bonds of conveyance are contemplated by this Act to be recorded. But in so far as concerns the Act we are now considering, this would, we think independent of authority, be too narrow a construction. But in the case of the *U.S. Ins. Co. v. Shriver*, 3 Md. Ch. 384, the Chancellor said: There is nothing, as I conceive, in the registry acts, which restricts them to conveyances of the legal title or estates, and in the words of that Eminent Judge, who delivered in opinion of the Court of Appeals in *Hays v. Richardson*, 1 G. & J. 384, 'Their design was that all *rights, incumbrances or conveyances,* touching *or in anywise concerning land,* should appear on the public records.' And we believe the general practice as to registration of papers has

---

**2.** This same provision appeared in Code (1957) Art. 21, § 26 and its successor provision, as enacted by Chapter 349 of the Laws of 1972, appears in Code (1973 Repl. Vol.) Art. 21, § 3-102.

been in accordance with this view before and since the adoption of the Code."
85 Md. at 543-44, 37 A. at 29.

*South Baltimore Harbor* was cited with approval and followed in *Lowes v. Carter,* 124 Md. 678, 684-85, 93 A. 216, 218 (1915), *supra.* An excellent review of the Maryland law appears in *Bourke v. Krick,* 304 F. 2d 501, 503 (4th Cir. 1962) in which Chief Judge Sobeloff (formerly Chief Judge of this Court) stated for the United States Court of Appeals for the Fourth Circuit:

"Article 21, section 1 of the Annotated Code of Maryland (1957), provides that 'No estate of inheritance or freehold, or any declaration or limitation of use, or any estate above seven years, shall pass or take effect unless the deed conveying the same shall be executed, acknowledged and recorded as herein provided; * * *.' Recording of an instrument under this section gives constructive notice of the transfer. See Ivrey v. Karr, 182 Md. 463, 34 A. 2d 847, 852 (1943); Anno. Code of Maryland Art. 21, § 13 (1957). Similarly, 'Every bond, writing obligatory or contract for the conveyance of real estate, or any interest or estate of, in, or relating to real estate, * * * may be executed, acknowledged and recorded in the same manner as deeds of real estate * * *.' Anno. Code of Maryland Art. 21, § 26 (1957). And such recordation gives constructive notice thereof. See Lowes v. Carter, 124 Md. 678, 93 A. 216, 218 (1915). The design of these statutes, as stated by the Court of Appeals of Maryland, is that 'all rights, incumbrances, or conveyances touching or in any wise concerning land should appear on the public records.' South Baltimore Harbor & Improvement Co. v. Smith, 85 Md. 537, 37 A. 27, 29 (1897).

"Consistent with this broad purpose, the Maryland court has approved the recordation of easements, deeds of real property for the benefit of creditors, deeds of trust, leases, contracts of

conveyance, restrictive covenants contained in deeds, drainage easements, option contracts pertaining to real property, as well as deeds of real property. In each instance, subsequent purchasers and creditors were held to have constructive notice of the recorded transaction." (References to notes omitted from the quotation)

The appellants further contend that, inasmuch as Document #2 was recorded *before* the plat for Subdivision No. 2, there was no duty by one examining the title to a lot within the subdivision to search beyond the recorded plat. This contention is also, in our opinion, without merit. Document #2 and the plat of Subdivision No. 2 were recorded the same day. Document #2 appears first in the land records, immediately followed by the plat. The Bury deed conveying Lot No. 12 specifically refers to both Document #2 and the plat so that an examiner of the title to Lot No. 12 was placed on notice that both the plat and Document #2 applied to that lot. In its acquisition of Lot No. 12 by Steuart Investment Company, the reference to both the plat and document appears in the direct chain of its title to that lot. The same comments are applicable to the second conveyance out of Subdivision No. 2 of Lot No. 1 by the Myrtle Tolson deed. Lot No. 1 was subsequently acquired by the Steuart Investment Company and is now owned by that Company. There seems little doubt that Steuart Investment Company had constructive notice of both the plat and Document #2. On this aspect of the constructive notice, the instant case, so far as Lots Nos. 1 and 12 are concerned, is an even stronger one than that involved in *Turner v. Brocato, supra,* in which we held that where a uniform general scheme or plan for the development of a tract of land has been established and the restrictive covenants or servitudes are imposed on the land, a subsequent purchaser is charged with constructive notice of the restrictions imposed in a prior deed whether in his direct chain of title or not. We stated in *Turner v. Brocato:*

"In addition to actual notice, we think that the land records afforded constructive notice of the

restrictions applicable to all of Poplar Hill. There are decisions holding that constructive notice is afforded only by a warning in the direct chain of title of the lot involved. . . . On the other hand, . . . in . . . the Pennsylvania case of *Finley v. Glenn,* 154 A. 299, where the action was to enjoin violation of building restrictions . . . the Court held that restrictions referred to in deeds from the same grantor of other lots gave constructive notice to the purchaser. This Court has agreed with the Pennsylvania Court. *Lowes v. Carter,* 124 Md. 678." 206 Md. 356-57, 111 A. 2d at 866.

The appellants point out that the appellees, when they purchased their respective lots in Subdivision #2, did not have actual knowledge of the existence of the restrictions previously imposed. This, however, is immaterial in view of our holding in *Turner v. Brocato, supra.* See the interesting and helpful case note on this case at 16 Md. L. Rev. 51, 59 (1956) where it is stated:

"In Maryland one is bound by every express encumbrance on his property which he could have found in the records. If the grantor covenanted in a deed to a prior purchaser to restrict his remaining land, any subsequent purchaser from him would be bound by the restrictions imposed in the prior deed, whether they were in his direct chain of title or not, assuming proper proof of a general plan. The Court of Appeals, by permitting enforcement of restrictions wholly implied against the present defendants, has carried record notice one notch further. Even though a subsequent purchaser be without actual knowledge of the restrictions, and though he can find nothing of record expressly encumbering his property, he is nevertheless bound by notice of express restrictions imposed by the grantor upon lots previously deeded away under the general plan; because *these* restrictions, though they do not concern the subsequent purchaser's land, raise the implication that the grantor

intended to restrict the entire development. This implication of reciprocity is the core of the implied restriction doctrine."

See also 2 American Law of Property, Sec. 9.33, at 431 (1952).

In a case note on Gnau v. Kinlein, supra, in 19 Md. L. Rev. 134, 141 (1959), the writer stated:

"The rule in Maryland that a grantee is bound by express encumbrance on his property which could be found by use of the grantor-grantee index of the land records, even though appearing in deeds not in the direct chain of title, is a harsh one."

Harsh or not, the rule is well established in this State.

The appellees also urge with much force that in the present case, there was actual knowledge by the appellants of the restrictions applicable to the lots in Subdivision No. 2, both from the close familiarity of William R. Saul, President of Steuart Transportation Company and Chief Engineer and Vice President of Steuart Petroleum Company, with the physical development of the lots since at least 1949 — relying on Turner v. Brocato, supra — and also from the knowledge of William Aleck Loker, who examined the title for the Steuart Investment Company, of the existence of the plat and Document #2 — relying on our decision in Williams v. Skyline Development Co., 265 Md. 130, 165, 288 A. 2d 333, 353 (1972). In view of our conclusion that the Steuart Investment Company clearly had constructive notice of the restrictions and equitable servitudes, it is unnecessary for us to decide whether that company also had actual notice of the restrictions and servitudes.

2.

We now turn to the contention of the appellants that, assuming, arguendo, that the uniform general scheme or plan of development for Subdivision No. 2 was validly established, in any event, the evidence indicated that such a general plan or scheme had been abandoned. Here again, the determination of abandonment is a question of fact and Rule 886 is present in full vigor. In Chevy Chase Village v.

*Jaggers,* 261 Md. 309, 316, 275 A. 2d 167, 171 (1971), we quoted *Texas Co. v. Harker,* 212 Md. 188, 198, 129 A. 2d 384, 390 (1957), as follows:

> " 'Most jurisdictions now recognize a change in the character of a neighborhood as a ground for affirmative relief against restrictive covenants by way of cancellation or modification *where the change has been so radical as to render perpetuation of the restriction of no substantial benefit to the dominant estate, and to defeat the object or purpose of the restriction.'* (Emphasis added) (Citing 4 A.L.R.2d 1118, 1119)

> *"Accord, Rogers v. State Roads Comm., supra,* 227 Md. at 566. The inquiry, therefore, is whether there has been a complete or radical change in the neighborhood causing the restrictions to outlive their usefulness." (Citing five prior decisions of this Court)

The chancellor found on this point:

> "The defendants further contend that the abandonment theory is supported by a change in the character of the neighborhood. We did not find support for that theory in viewing the premises. * * * "

> "The only substantial change is the construction of the defendants' existing commercial pier from an unrestricted area of the Tolson property which they leased in 1949 and later acquired. But the character of the first subdivision and Subdivision No. 2 remains unchanged and the restrictions imposed on the beach area afford the same benefits to the lot owners today as they did when imposed by the Tolsons."

We conclude that the chancellor's findings of fact are supported by competent evidence and are not clearly erroneous and further that his conclusion that there had been no abandonment was not clearly in error.

### 3.

The proposed construction of the commercial pier by the Steuart Investment Company and the use of the existing pier in front of Lot No. 2 by that Company and by the Steuart Transportation Company are in conflict with the applicable restrictions and equitable servitudes which limit the use of the "parkage" area.

There seems to be little doubt that the Tolsons could lawfully restrict the riparian rights in front of the lots in Subdivision No. 2. In *Williams v. Skyline Development Corporation,* 265 Md. 130, 288 A. 2d 333 (1972), *supra,* the deed was in fee simple but contained the following provision:

> " 'PROVIDED, HOWEVER, that the grantee herein, his heirs and assigns, shall have no right to extend said lots beyond their present lines, as shown on the aforesaid plat, by causing, in any manner whatsoever, artificial accretion thereto; the grantor herein hereby expressly reserving unto itself, its successors and assigns, all lands, as shown on the aforesaid plat, adjacent to said lots which lie beneath the waters of Isle of Wight Bay;
> . . . .' "

265 Md. at 140, 288 A. 2d at 340.

We stated:

> "The appellants earnestly contend that under the provisions of Code (1957) Art. 54, §§ 45 and 46, . . . the riparian right of the owner of land to make improvements in navigable waters in front of his land being an *exclusive* right may not legally be severed from the land and hence the provision and reservation in the Boinis Deed by Skyline was null and void. We do not agree with this contention."
>
> ". . . We have never had occasion heretofore to hold that the riparian rights to wharf out, erect bulkheads and fill in front of land may lawfully and effectively be severed from the land by grant or

reservation. We now hold that they may be so severed."
(Emphasis in original)
265 Md. at 154-56, 288 A. 2d at 348.

It is apparent that if riparian rights may be completely severed from the land, *a fortiori,* they may be restricted by the owner of those rights. As we have already indicated, the riparian rights appurtenant to the several lots in Subdivision No. 2 were validly restricted by the uniform general scheme or plan of development so that the chancellor did not err in passing the decree of July 11, 1972, enjoining the appellants as we mentioned at the beginning of this opinion.

> *Decree of July 11, 1972, affirmed, the appellants to pay the costs.*

WARREN Tolson's
Subdivision No. 2
in Pinxey Point