17105

ROBERT J. EDWARDS, JANE A. NEAL, DAN H. McKINNEY, and G. P. PATTERSON, Appellants, v. PAUL LEWIS SURRATT, Respondent

(90 S. E. (2d) 906)

514

[redacted]

*Messrs. Leatherwood, Walker, Todd & Mann,* of Green-
ville, *for Appellants,*

*Messrs. L. A. Hutson, Jr.,* and *Ralph W. Drake,* of Green-
ville, *for Respondent,*

January 11, 1956.

T. B. GRENEKER, Acting Associate Justice.

This is a suit in equity instituted by the appellants, plain-
tiffs below, against the respondent, seeking an injunction
prohibiting the respondent from using his property for any
purpose other than for residential use and more particularly
prohibiting him from proceeding with the erection of a filing
station alleged to be in violation of certain restrictions placed
thereon by Vance Edwards, now deceased. The matter came

on for a hearing before Honorable W. B. McGowan, Judge of the Greenville County Court, who on September 25, 1954 filed his order denying. plaintiffs the relief sought. The appellants now come to this court seeking a reversal of Judge McGowan's order.

We gather from the record that Vance Edwards, the common predecessor in title of the plaintiffs and defendant, formerly owned a tract of land in Greenville County containing some seven hundred acres on or near what is now known as the Super Highway running from Greenville to Spartanburg; and it is alleged by the plaintiffs that Edwards intended to develop that property into an exclusive residential area and that he, from time to time, sold parts of this property; and in some of his conveyances, as an indication of his purpose, inserted certain restrictions. Annie Turner Lindsey, on June 16, 1941, purchased from Edwards a tract containing 3.47 acres, and the deed conveying this tract contained the following restriction: "Said property to be used for residential purposes for white people only". Annie Turner Lindsey subdivided the 3.47 acres into five lots which were sold to various parties. The lot, which is the subject of this action is one of those five lots, and was acquired by the defendant Surratt in 1950 from Annie Turner Lindsey, and upon which he proposes to build a filling station.

On October 31, 1953, all of the owners of lots within the 3.47 acre tract, which was purchased by Annie Turner Lindsey from Vance Edwards, executed an instrument, which was duly recorded on November 2, 1953, releasing the restrictions on all of the lots in that tract and declared that no action would be taken at any time for the purpose of enforcing the restrictions.

The appellants do not own any of the lots embraced in the Lindsey tract, which, as above pointed out, contains 3.47 acres. By reference to the Lindsey deed, we find this property described as follows: "All that piece, parcel or lot of land in Chick Springs Township, Greenville County, State

of South Carolina, at the intersection of Super Highway No. 29 and Lee Road, being triangular in shape and having, according to the survey and plat made by R. E. Dalton in June, 1941, the following courses and distances, to wit": Any additional description was omitted from the transcript. No reference is made to the adoption of a master plat by which the conveyance was made, and we find none in the record; nor was there in the Lindsey deed any reference to any group of general or special restrictions governing the 3.47 acre tract such as we find in the record relating to Buena Vista, Pinehurst and Mayfair, other parts of the Edwards Property, but adopted several years later. It may be of passing interest to notice how the plaintiffs acquired their respective lots, and when and by whom were the restrictions placed thereon. Jane A. Neal acquired her lot in 1941 from Robert J. Edwards, who then and there placed the restrictions. Patterson's property was acquired from Robert J. Edwards, Committee for James Edwards, in 1952 and the restrictions were accordingly placed. McKinney also acquired his property through the Committee for James Edwards in 1954 and the restrictions thereon were then and there placed.

The plaintiffs based their action upon the theory: first, that the restrictions in the Lindsey deed were intended for the benefit of the remaining property of Vance Edwards (about 720 acres) and were enforceable by his subsequent grantees; second, that there was a general scheme or plan of development which would give to the appellants the right to insist upon the compliance by the respondent with the restrictions contained in his chain of title.

When Robert J. Edwards, one of the plaintiffs, was being cross-examined, he was asked:

"Q. Are you plaintiffs asking the enforcement of the restrictions you put on the property or Vance Edwards put on the property?" Counsel for the appellants was given permission to answer that question and stated: "Our position is we are relying from the standpoint of Edwards, upon

restrictions which were actually placed upon the Surratt property by Vance Edwards, we are relying on this so far as Robert Edwards is concerned from the standpoint he is an heir of Vance Edwards who placed those restrictions upon that property and as an heir of Vance Edwards, also he is an adjacent property owner". The Court: "I didn't think you were standing on restrictions these various heirs placed on the property". Mr. Mann: "No, sir, we are standing on those of Vance Edwards".

With this in mind, we consider the conveyances made by Vance Edwards and find that on September 15, 1938, he sold to Annie Turner Lindsey one acre with no restrictions as per plat of R. E. Dalton, made on the same day. After the conveyance of the 3.47 acre tract to Mrs. Lindsey in 1941, he conveyed one lot to Robert J. Edwards with no restrictions. Then on July 23, 1943, more than two years after the Lindsey deed, Vance Edwards began to execute deeds which stated that the impressed restrictions on the property therein conveyed were for the benefit of the grantor, grantee and other persons owning property adjoining or in the vicinity. There were eleven such conveyances prior to his death. The exhibits, taken from the public records of Greenville County, beginning in 1943, furnish the first evidence of any such intention of Mr. Edwards, and if it be that such expression of intention was sufficient to indicate that the restrictions were intended for the benefit of his other or remaining property, such restrictions could only operate as to subsequent purchasers but in no event to prior purchasers. After the property had passed from Vance Edwards, we scarcely think that even the most careful examiner of the records would be required to consider any later acts of Mr. Edwards relative to the property previously conveyed. The first conveyance by Mr. Edwards in 1938, as stated, contained no restrictions and a motor court was later erected thereon. This lot was according to plat made in 1938. The next three conveyances, all in September, 1940, according to a survey made in September, 1940, contained similar building restrictions; and next appears the Lindsey deed,

according to plat made in June, 1941. No reference is made in the Lindsey deed which would indicate that the property thereby conveyed was a part of a designated sub-division for which there had been provided general or special restrictions. In the transcript there are found governing restrictions for "Pinehurst", "Mayfair" and "Buena Vista", neighboring sub-divisions. However, these restrictions were not formulated until April, 1948 and April, 1949, while the Lindsey property was conveyed in 1941 by Vance Edwards who died in 1945.

By virtue of the holdings of this court in the cases of *Pitts v. Brown*, 215 S. C. 122, 54 S. E. (2d) 538 and *Martin v. Cantrell*, 225 S. C. 140, 81 S. E. (2d) 37, and upon which appellants heavily lean, had one of the owners of any of the five lots in the 3.47 acre Lindsey tract, before release of restrictions, sought to enjoin the violation of the restrictions *inter sese,* he may have possibly reasoned that he at least had some foundation for his action. In *Pitts v. Brown, supra,* there was involved a sub-division known as Sans Souci Villa containing 25.97 acres, cut into fifty-eight building lots and shown by a duly recorded plat. The parties there were all owners of lots within the designated area. In *Martin v. Cantrell, supra,* again we find a designated area, Furman Development Company, with a recorded plat of the whole, cut into forty-one lots, streets, curbs and sidewalks laid out, and the action was between parties who owned lots in the sub-division. The holding in *Sprouse v. Winston,* 212 S. C. 176, 46 S. E. (2d) 874, is to the same effect. There we find a map of the sub-division, duly recorded, as well as a recordation of all the restrictive covenants covering all of the lots in the sub-division; and there again the action was between owners of lots within the designated area.

One of the controlling principles in the above decisions is that where a common grantor opens a tract of land to be sold in lots and blocks, and, *before any lots are sold* (emphasis ours), inaugurates a general scheme of improvement for the entire tract intended to enhance the

value of each lot, and each lot, subsequently sold by such grantor, is made subject to such scheme of improvement, there is created and annexed to the entire tract what is termed a negative equitable easement, in which the various purchasers of lots have an interest, and between whom there exists mutuality of covenant and consideration. *Sprouse v. Winston, supra,* and *Couch v. Southern Methodist University,* Tex. Civ. App., 290 S. W. 256. We have also held that restrictive covenants are to be construed most strictly against the grantor and persons seeking to enforce them, and liberally in favor of the grantee, all doubts being resolved in favor of a free use of property and against restrictions. This rule of course will not be applied to defeat the obvious purpose of the restriction and before giving effect to the rule, the court will have recourse to every aid or canon of construction to ascertain the intention of the parties. 26 C. J. S., Deeds, § 163.

In the case now before us, did there exist, at the time Mr. Edwards sold the 3.47 acre tract to Mrs. Lindsey, a general scheme of improvement for the entire Edwards tract and was there any mutuality of covenant and consideration? It appears, from the record, that from 1938, when Mr. Vance Edwards made the first conveyance, until the time of his death in 1945, he made seventeen conveyances. The lands or lots conveyed were not contiguous and some seem to have been as much as a mile apart. Let us examine the pattern of these conveyances. Fifteen contained the building restrictions, two did not. In three of these there was no reference to any plat, but metes and bounds were given. It further appears that some of the plats were made at the same time the deeds were executed, and six of the deeds referred to specifically prepared plats for each lot conveyed. The Lindsey tract was platted in June, 1941 and the deed conveying same was executed in June, 1941. Five of the conveyances, for lots about a mile from the Lindsey tract, referred to specifically prepared plats in October, 1938 by Dalton & Neeves. Three of the deeds referred to plat made in September, 1940.

If we consider all of the conveyances made by Mr. Edwards, it becomes rather difficult to conclude that the plan or pattern adopted by him was sufficient to bring all of the property contained in these conveyances, along with the very large acreage owned by him, into a single area of improvement so as to bring home to Mrs. Lindsey, at the time she purchased her tract, that her property would be controlled by restrictions which might, in the future, be placed on the remainder of the seven hundred acres. There were no provisions in her deed stating that the limited restrictions therein were for the benefit "of the present and future owners of this and other lots in the vicinity of the above described lot". Neither did the Lindsey deed make any restriction therein a part of the consideration. Under these circumstances, could there be mutuality of covenant? There was no definite or designated area established, the deeds and plats were separate and distinct, and no master plat designating the restricted area adopted.

It is not unimportant to notice that the plaintiff Robert J. Edwards has permitted to be erected on some of the property inherited by him from Vance Edwards a motor court, while other Vance Edwards heirs, on a part of the seven hundred acres inherited by them, have permitted what is properly called a business district.

Throughout the case the name of the plaintiff Robert J. Edwards occurs. He acted as committee for his brother James, he owned lands in the area and he inherited other lands from his brother Vance. He also seems to have swapped lands with his brother Vance. The following testimony of his is interesting:

"Q. And this property that you sold Jane Neal (one of the plaintiffs), did your brother Vance Edwards own that? A. Part of it.

"Q. Is this triangular piece down here at the lower corner next to the super highway, is that a portion that was owned by your brother Vance Edwards? A. Yes. Anyway, we had three lots in there.

"Q. That was part of the property you all were engaged in swapping? A. Yes, sir.

"Q. In swapping property with your brother Vance Edwards, did you put restrictions in the deeds to each other? A. I don't think we did.

"Q. When you conveyed the property to Mrs. Neal, did you put in any restrictions in the deed? A. Yes, sir.

"Q. You put those restrictions yourself? A. Yes, sir.

"Q. Your brother before had not put any restrictions in the title to Mrs. Neal? A. Well, I bought several pieces of property from him, he did not restrict it, he told me he requested me to restrict it.

"Q. He left it up to you to restrict it? A. Yes, sir.

"Q. When you received your full portion of the estate (Vance Edwards') were any restrictions put in the deed bringing that property to you? A. No, sir."

It is alleged by the appellants that the restrictions imposed on respondent's land were imposed "for the benefit of said Vance Edwards, his heirs and assigns and for the benefit of all other property in the neighborhood", and that "Vance Edwards owned a considerable tract of land near and about the land conveyed to the defendant, that it was his intention to develop said tract of land * * * as a high class residential development and that said restrictions were imposed to carry out such purpose".

The success of their action thus bottomed depends upon whether or not the evidence offered, the burden of proof resting upon them, is sufficient to sustain these allegations.

The text writers and courts generally agree that a restriction of property must be created in express terms or by plain and unmistakable implication. 14 A. J., 1955 Cum. Sup. Sec. 196; *Starmount Co. v. Greensboro Memorial Park*, 233 N. C. 613, 65 S. E. (2d) 134, 25 A. L. R. (2d) 898.

It is also true that the principles set out in our own cases of *Pitts v. Brown, Sprouse v. Winston* and *Martin v. Cantrell, supra,* have been generally adopted by the courts. *McComb v. Hanly,* 132 N. J. Eq. 182, 26 A. (2d) 891, 144 A. L. R. 912.

At the time of the Lindsey deed, what was there to show that her grantor impressed the deed to her with restrictions "for the benefit of all other property in the neighborhood"? It was not so expressed in the deed, there were no general restrictions adopted by the grantor referred to in the deed, there was no master plat in evidence which may have shown a general or neighborhood plan and the plat covering the property seems to have been made at the same time as the deed. Certainly there was no writing "clearly expressing" that the restrictions were for the benefit "of all other property in the neighborhood" and we can not say that such intention was shown by "plain and unmistakable implication".

Is there found in the Lindsey deed any notice or indication of what Mr. Edwards intended to do with his remaining large acreage? In the light of the record, could Mrs. Lindsey have required Mr. Edwards to restrict all the remaining land in the seven hundred acre tract?

To create an equitable easement in favor of a grantee in property retained by the grantor, the deed should contain not only some reference to a common plan of restriction or indication of agreement between the parties that the conveyed parcel be taken subject to some such plan, but also some designation or description of the dominant tenement. *Wing v. Forest Lawn Cemetery Ass'n,* 15 Cal. (2d) 472, 101 P. (2d) 1099, 130 A. L. R. 120.

The mere fact that a grantor imposes restrictions upon a lot conveyed, with respect to the manner of using or subdividing the lot, raises no inference or implication that the remainder of his property, not covered by the conveyance, will be similarly restricted, in the absence of a general plan or scheme. See annotations 144 A. L. R. 916.

The fact of imposing restrictions on the use of lots sold from a tract of land does not obligate the grantor to restrict the remainder of his property in the absence of some evidence of purpose to bind the remaining land, made known to the grantees. *Price v. Anderson,* 358 Pa. 209, 56 A. (2d) 215, annotated 2 A. L. R. (2d) 593.

In order to establish a reciprocal negative easement, by implication from an express easement on the land of the grantee, there must be proof of a scheme or general plan of restrictions, orginating from a common owner, and a restriction placed upon a single lot does not establish such a plan. *Denhardt v. De Roo,* 295 Mich. 223, 294 N. W. 163.

Where there was nothing in a deed containing a dwelling house restriction indicating that the covenant was for the benefit of anyone but the grantor, and there was no provision for the insertion of similar covenants in other deeds to be made by the grantor, and there was no other feature of the transaction which would disclose an intention that the covenant should attach to and be for the benefit of other land of the grantor, it was held that the complainant could not enforce it. *Hemsley v. Marlborough Hotel Co.,* 62 N. J. Eq. 164, 50 A. 14; Id., 63 N. J. Eq. 804, 52 A. 1132.

Can it be said that the appellants' method of dealing with the Vance Edwards property is such that would justify the court in holding that they recognized the obligation of reciprocal restrictions? The following is a part of the testimony by the plaintiff Robert J. Edwards:

"Q. Let me ask you this, this triangular portion where the Wade Hampton Motel is located, you once owned that property? A. Yes, sir, I owned it, I sold it as part of the Vance Edwards estate.

"Q. That property have any restrictions on it? A. Well, I bought that property from him, and a little piece in front of my house, those two pieces of property, from him.

"Q. Did he put any restrictions in the deed? A. No, no restrictions in the deed and I asked him if he wanted restrictions.

"Q. Your brother was not delinquent—A. He asked me to restrict it.

"Q. He put no restrictions in the deed? A. No; well, certain restrictions to a certain extent.

"Q. What are those restrictions? A. Well, told me when he sold it, he didn't want any transfer, or anything that would be a nuisance.

"Q. Did you put it in the deed? A. Put in there.

"Q. No restrictions about not putting residences there, left open for commercial property? A. Open for commercial property to a certain extent, but it was restricted and Scurry told me he wouldn't buy it if it didn't have some kind written on it.

"Q. You could put up a commercial establishment like the Wade Hampton Motel? A. O, yes.

"Q. You sold that for motor court purposes, anyway? A. I didn't have any kick on it; they didn't object to it.

"Q. Now, we come down the highway going towards Taylors and we find more business establishments? A. Of course, I am not interested when you pass the Dixie Home Warehouse.

"Q. We are interested; you have more business as you pass Wade Hampton Motel you have more business establishments? A. I didn't put them in there.

"Q. That is part of the Vance Edwards estate? A. Yes, sir, but I didn't have control of it.

"Q. I am trying to see how far you are trying to make residential out of this area. You have an Esso filling station? A. Yes, sir.

"Q. You have a real estate office? A. Texaco station and—

"Q. I believe you have a hardware store also? A. Yes, sir.

"Q. Then you have the Sammons Tourist Court up the road? A. That is up the road further.

"Q. And you come on towards Taylors and you have a manufacturing plant, Veeder Root? A. A mile down the road, the other side.

"Q. This is all a part of your brother, Vance Edwards' estate? A. No—yes, Vance Edwards estate.

"Q. They still come out of property of the Vance Edwards estate? A. They are a part of it.

"Q. The other side of the road you have the Dixie Home Warehouse? A. Yes.

"Q. Come on down the road and you have another real estate office, Langston Real Estate office? A. Now, you are getting off the Vance Edwards property."

As we view the entire record, we reach the conclusion ██ ██ that there were set up separate and distinct units within the large area of the Vance Edwards land rather than a single development of the entire area according to any general scheme or plan. When this is the case, as was said in *Craven County v. First-Citizens Bank & Trust Co.,* 237 N. C. 502, 75 S. E. (2d) 620, effect will be given to the restrictions as it may be determined they relate to the separate units, with the right of the property owners in each unit to enforce them *inter se.*

As we have endeavored to point out, the record here presents a different factual situation than existed in the *Pitts* and *Martin cases, supra,* and the appellants here have failed to come within the provisions of these cases.

The order and judgment of the Greenville County Court, from which this appeal was taken, should be affirmed, and it is so ordered.

STUKES, TAYLOR, OXNER and LEGGE, JJ., concur.