720 A.2d 1214

**Eric J. MIKOLASKO, et al.**

v.

**Thomas Randolph SCHOVEE, et al.**

**No. 221, Sept. Term, 1998.**

Court of Special Appeals of Maryland.

Dec. 2, 1998.

Jerrold A. Thrope (Charles R. Bacharach and Gordon, Feinblatt, Rothman, Hoffberger & Hollander, L.L.C., on the brief), Baltimore, for Appellants.

Kurt J. Fisher (John P. Machen, Brett Ingerman and Piper & Marbury, L.L.P., on the brief), Baltimore, for Appellees.

Argued before THIEME and KENNEY, JJ., and THEODORE G. BLOOM, Judge (retired), Specially Assigned.

THIEME, Judge.

This appeal by Eric J. Mikolasko and J.J.M., Inc., is from a judgment of the Circuit Court for Howard County that granted declaratory and injunctive relief requested by the appellees, Thomas Randolph Schovee, et al., property owners in the Chapel Woods II subdivision. The effect of the judgment was to thwart the appellants' plans to resubdivide certain lots within the subdivision.

### Statement of Facts

Chapel Woods II is a residential subdivision in Clarksville, Howard County, Maryland. The developer, J.J.M. Partnership, was given approval for the subdivision by Howard County in November 1989. J.J.M., Inc., is the general partner of

J.J.M. Partnership, and Eric J. Mikolasko is the vice president of J.J.M., Inc. The developer recorded a revision plat for the subdivision in the Howard County land records on April 20, 1990. The developer also recorded the "Chapel Woods II Declaration of Covenants, Easements, Conditions and Restrictions" (the Declaration) in the same land records on November 20, 1989. The Declaration contained a statement that it was to be deemed part of a general scheme of development; a description of the land use restrictions and covenants to be applied to the subdivision; and, in an attached exhibit, a description of the property to be covered by the Declaration. The property described included Lots 1–5 and Lots 8–25 on the subdivision plat. These lots were between three and six acres in size. Lot 6 was not owned by the developer and is not at issue in this case. Lot 7, a land parcel of some 50 acres, was retained by the developer. Lot 8 was owned by the appellant Eric Mikolasko, individually.

The appellees are a group of seven couples who purchased lots in Chapel Woods II from the developer between September 1989 and June 1991. Apparently, each agreement of sale between the developer and the purchasers included a copy of the Declaration, and each deed incorporated the Declaration by reference. Nevertheless, each appellee-purchaser who provided evidence claimed to have been led to believe, by a variety of factors, that Lot 7 was part of the common development scheme of Chapel Woods II.

In 1995, appellant Mikolasko submitted to the Howard County Subdivision Review Committee a proposal for a new subdivision called Chapel Woods III. The plan depended on the merger of Lots 7 and 8 and their resubdivision into nine one-acre lots on which residential dwellings would be built, with large parts of the remaining property being placed into an irrevocable conservation easement.

### Statement of the Case

On December 21, 1995, the appellees filed a six-count complaint in the Circuit Court for Howard County. The six counts were as follows:

I. Request for declaratory judgment declaring that Lot 7 is subject to the covenants and restrictions contained in the Declaration by means of an implied negative reciprocal easement;

II. Request for declaratory judgment declaring that Lot 8 is subject to the covenants and restrictions contained in the Declaration;

III. Request for declaratory judgment declaring that section 4.1.1.(b) of the Declaration prohibits the subdivision of any lot presently part of Chapel Woods II;

IV. Request for declaratory judgment declaring that the proposed merger and resubdivision of Lots 7 and 8 violate the Declaration;

V. Request for ex parte and interlocutory injunctions prohibiting the proposed merger and resubdivision of Lots 7 and 8;

VI. Request for a permanent injunction prohibiting the proposed merger and resubdivision of Lots 7 and 8.

On the same day, the appellees filed a motion for partial summary judgment on counts II–IV of the complaint. On January 3, 1996, the appellees abandoned count V. On February 5, 1996, the appellants filed an opposition to appellees' motion, a cross-motion for summary judgment, and a request for a hearing.

A hearing on the motions was held on March 29, 1996, when the appellants also filed a motion to dismiss with prejudice, based on the fact that Howard County had given approval to the Chapel Woods III project and a plat had been recorded. By a memorandum and order of May 30, 1996, the court denied the appellants' motions for summary judgment and dismissal, and granted the appellees' motion for summary judgment on count II and on counts III and IV with regard to Lot 8 only, *i.e.*, the court ruled that "the Declaration prohibits construction of more than one residential dwelling on any one Lot, including Lot 8 (as it existed at the time the Declaration was recorded)."

On April 30, 1997, a bench trial began. By a memorandum opinion and order dated November 25, 1997, and in part reiterating its order of May 30, 1996, the court found in favor of the appellees and granted their requests with regard to counts I–IV and VI.

This appeal was timely noted on December 22, 1997.

### *Questions Presented*

The appellants ask the following questions:

I.   Did the trial court err, as a matter of law, in imposing a reciprocal negative easement on Lot 7 where the blanket declaration of restrictions and covenants for the Chapel Woods II community specifically burdens only Lots 1–5 and 8–25?

II.  Did the trial court err in finding that the property owners had shown the grantor's intent to burden Lot 7 with the restrictions applicable to Lots 1–5 and 8–25 by clear and convincing evidence?

III. Does Chapel Woods III comply with a general scheme of development for single family homes where new lots are the same price and subject to virtually the same restrictions on use as the restrictions on the lots in Chapel Woods II?

IV.  Did the trial court err in finding that additional building lots were prohibited by the Chapel Woods II Declaration?

V.   Did the trial court err in enjoining the merger and subdivision of Lots 7 and 8 into Chapel Woods III after Howard County had already approved the merger and subdivision?

To questions I and II, we answer, yes. To question IV, we answer no. To question V, we answer no with regard to Lot 8. We decline to answer question III.

### Standard of Review

When an action has been tried without a jury, the appellate court will review the case on both the law and the evidence. It will not set aside the judgment of the trial court on the evidence unless clearly erroneous, and will give due regard to the opportunity of the trial court to judge the credibility of the witnesses.

Md. Rule 8–131. In this particular type of case, we have held that,

since "the intention to establish a uniform scheme or plan of development is a question of fact ... " the chancellor's findings will not be set aside " 'on the evidence unless clearly erroneous' after giving due regard to the opportunity of the chancellor 'to judge the credibility of the witnesses.' ' " Furthermore, the appellate Court will not "reverse the chancellor's conclusions from the facts found by him if within the provisions of the applicable law unless they are clearly in error."

*Bernui v. Tantallon Control Committee,* 62 Md.App. 9, 14, 488 A.2d 186 (1985) (quoting *Steuart Transportation Co. v. Ashe,* 269 Md. 74, 89, 304 A.2d 788 (1973)) (citation omitted).

### Doctrine of Implied Reciprocal Negative Easements

In *McKenrick v. Savings Bank of Baltimore,* 174 Md. 118, 197 A. 580 (1938), the Court of Appeals listed the following principles of the doctrine of the implication of reciprocal negative easements based on a finding of a uniform or common or general plan or scheme of development:

That one owning a tract of land, in granting a part thereof, may validly impose upon the part granted restrictions upon the use thereof, for the benefit of the part retained, and upon the part retained for the benefit of the part granted, or upon both for the benefit of both; that, where the covenants in the conveyance are not expressly for or on behalf of the grantor his heirs and assigns, they are personal and will not run with the land, but that, if in such a case it appears that it was the intention of the grantors that the

restrictions were part of a uniform general scheme or plan of development and use which should affect the land granted and the land retained alike, they may be enforced in equity; that covenants creating restrictions are to be construed strictly in favor of the freedom of the land, and against the person in whose favor they are made; and that the burden is upon one seeking to enforce such restrictions where they are not specifically expressed in a deed to show by clear and satisfactory proof that the common grantor intended that they should affect the land retained as a part of a uniform general scheme of development.

*Id.* at 128, 197 A. 580.

The leading Maryland case applying these principles is *Turner v. Brocato*, 206 Md. 336, 111 A.2d 855 (1955), in which several subdivision lot owners sought to enforce a noncommercial use restriction against a lot not expressly bound by the restriction. The Court of Appeals found that the whole subdivision was subject to a general development scheme, basing that conclusion on the following evidence: restrictions imposed in the majority of the deeds; testimony of lot owners concerning their belief that the whole community was restricted; a sign, placed on the lot in question at the entrance to the community, identifying it as a restricted community; and the mention of the community restrictions in the contracts of sale and representations of salesmen. *Id.* at 349–50, 111 A.2d 855. From the finding of a general plan, the Court was able to imply a noncommercial use restriction on a lot, even though the deed to the lot did not contain the restrictions.

■ The trial court in the instant case applied factors [1] derived from *Turner* to imply a reciprocal negative easement

---

**1.** To enforce a restriction against a lot of land not expressly subjected to that restriction, under the implied negative reciprocal easement doctrine, the enforcing party must show: (i) a common owner subdivided property into a number of lots for sale; (ii) the common owner had an intention to create a general scheme of development for the property as a whole, in which the use of land was restricted; (iii) the vast majority of the subdivided lots contain restrictive covenants which reflect the general scheme; (iv) the property against which

prohibiting resubdivision and the building of more than one residential dwelling on Lot 7, which was not expressly encumbered. In most such cases, the finding of a uniform development plan is the critical issue. *See* Restatement (Third) of Property: Servitudes § 2.14 cmt. f (Tentative Draft No. 1, 1989). Yet, in the case *sub judice,* in its Memorandum Opinion the trial court stated it "has no difficulty finding that the intended purpose of the Declaration and [the appellants] was to create a common scheme of development." Here, rather, the more crucial question is "the threshold determination made in *Turner*—that the parcel of land at issue was part of the development for which the general scheme was established." *Bernui,* 62 Md.App. at 16, 488 A.2d 186.

### Determining Which Property Is Part of the Uniform Development Plan

The trial court concluded that Lot 7 was included in the common development scheme. The evidence the court relied on for that proposition included the following facts: the inclusion of Lot 7 on the community plat and its meeting the basic acreage requirement of the community; Lot 7's frontage being nearly identical to the other lots of the community; representations made by the appellants and their agents concerning the inclusion of Lot 7 in the community; advertisements posted in the locale of the community, as well as maps and other promotional materials, all showing the community demarcated by a bold, black line, which included Lot 7.

The Declaration, which was properly recorded and was incorporated by reference into each of the deeds of the appellees, however, contains a different description of the property to be included in the community:

_____

application of an implied covenant is sought was intended to be part of the general scheme of development; and (v) the purchaser of the lot in question had notice, actual or constructive of the restriction. Memorandum Opinion, at 21 (citing *Turner,* 206 Md. at 350–51, 111 A.2d 855; *Markey v. Wolf,* 92 Md.App. 137, 155 n. 10, 607 A.2d 82 (1992)).

Section 2.1: "The Property shall contain twenty-four (24) residential lots ("Lots")...."

Section 1.13: " 'Property' means that parcel of land described in Exhibit A attached hereto and made a part hereof."

Exhibit A: *"Description of the Property:* Lot Nos. 1 through 5 (inclusive) and 8 through 25 (inclusive) as shown on a plat entitled 'Chapel Woods II, Lots 1–25'...."

Lot 7 is not included under the Declaration. (We will not address the apparent inconsistency between the number of lots mentioned in section 2.1 and those enumerated in Exhibit A. Both of the parties maintained and the court below in its Memorandum Opinion found that Lot 7 was expressly **not** covered by the Declaration.)

### Common Development Scheme and the Declaration

The question then becomes: What is the relationship between the common development scheme and the Declaration? As the trial court saw it, the Declaration was but a piece of evidence as to the existence and extent of the common development scheme: "In addition to the testimony of the various witnesses, the documentary evidence, including but not limited to the Declaration, supports the Court's conclusions that there was a common scheme of development for Chapel Woods II." Yet in the court's Order, Lot 7 is made "subject to the covenants and restrictions set forth in the Declaration," and to nothing more. On the one hand, the Declaration exclusively supplies the covenants and restrictions that make up the burdens of the common scheme. On the other hand, the court extended the burdens of the common scheme beyond the properties expressly outlined in the Declaration.

In examining the court's reasoning, we are reminded of a case similar in several respects to the present case:

In the case *sub judice,* the chancellor found that the parcel of land upon which appellant's house was being built is not subject to the restrictive covenants. He added, however, that there is a general plan of development for the commu-

nity, that the "basic plan covers the lots in ... [the community] that are not covered by the restrictive covenants," and that "the plan basically is the covenants, even though the covenants don't apply...." In support, the chancellor relied upon the facts that most of the lots in the community were subject to the restrictive covenants, and that everyone in the community adhered to them.

*Bernui,* 62 Md.App. at 14–15, 488 A.2d 186 (alterations in original). We come to the same conclusion in this case that we reached in *Bernui:* "We hold that as a matter of law, these facts do not establish that the parcel of land at issue is governed by the restrictions of a general scheme." *Id.* at 15, 488 A.2d 186.

### *Maryland Case Law*

In *Turner,* the Court of Appeals dealt with a situation in which there was no recorded declaration or plan that might guide a determination of whether a general development scheme existed and, more important for our purposes, which properties would be included in it. That there was a general plan of development and that the lot in question was part of the subdivision were factual determinations that were based on a variety of evidence. The facts considered in concluding that a general plan was in place were mentioned above. Before the Court addressed that question, it made a preliminary conclusion concerning whether the lot in question was a part of the Poplar Hill subdivision:

> We think it clear that the finger of land was a part of Poplar Hill and a part of Section C. It was part of the tract [the developer] bought. It was shown as part of the development on all of the plats. The sign advertising Poplar Hill as a restricted residential development stood for twenty years on this very lot. The evidence of the case seems to leave no doubt that it was always regarded by those who dealt with the property as a part thereof. The fact that it was unnumbered [on the revised subdivision plat] would not seem to be decisive. The argument that the finger of land was not intended as, and was not in fact, part of the

development because it faces Falls Road, is difficult to maintain in the face of the fact that lot eighty-eight, on which stands the gatehouse [for the whole subdivision], is on Falls Road and was sold for residential purposes early in the development, and is so used today.

*Turner*, 206 Md. at 345, 111 A.2d 855 (citation omitted). These facts were all considered relevant in including the property in the common scheme, given that no recorded document, not even the plat in this case, specified the extent of the scheme.

In *Gnau v. Kinlein*, 217 Md. 43, 141 A.2d 492 (1958), property owners brought an action against subdividers to enforce the restrictions imposed in the straw man, dedication deed on the property retained by the subdividers. The Court affirmed the chancellor's alternative finding of a common development scheme based on "the language of the deeds and the [other, extrinsic] evidence before him...." *Id.* at 50, 141 A.2d 492. On the question of how the covenants ran and which property was bound by the covenants, the Court concluded:

The language used in the [dedication] deed states expressly that the restrictions were to be binding upon the [subdividers] and their grantees, and the heirs and assigns of both, and "upon all of the land included in said tract"; and that no transfer is to be other than subject to the said restrictions which are to "run with and bind the land and each and all of the above mentioned lots...." The restrictions, further, expressly are to be "kept and performed by and inure to the benefit of and be enforceable by all and every person ... at any time owning or occupying said land ..." or any part of it. We have no difficulty in concluding that the [subdividers] intended to and did bind themselves, and every part of the land in [the subdivision] owned by them at any time, fully to the restrictions.

*Id.* (elisions in original). Thus, in determining which property was bound, the Court had exclusive recourse to the dedication deed.

In *Steuart,* the Court was presented with a case in which subdividers had recorded a subdivision plat, a declaration of covenants ("dedicatory supplement"), and deeds for the first two grants out, which incorporated the plat and the declaration. The difficulty arose from the fact that the deeds of later original grantees and purchasers from original grantees did not contain the incorporation of the subdivision plat and declaration. The Court was asked to affirm the implication of the covenantal restrictions to three contiguous, commonly-owned lots, which were being used in a proscribed fashion. The lots in question were clearly identified and included in the plat and the declaration. *Steuart,* 269 Md. at 75, 79, 100, 304 A.2d 788. To a large extent, the Court relied on the evidence of the plat and declaration in affirming the finding of a uniform development plan:

> [T]he effect of the plat and dedicatory supplement (Document # 2) of Subdivision No. 2, when taken together, indicates a uniform general plan of development. The supplement described the restrictions and servitudes which the [subdividers] intended to apply to Subdivision No. 2 and purchasers of the lots in that subdivision were bound by the restrictions if they purchased with notice of them.

*Id.* at 89, 304 A.2d 788. The Court, following *Turner,* did recite that "extrinsic" evidence could be considered. But in *Steuart,* where there were recorded documents establishing a uniform development plan, the extrinsic evidence was supplementary: "The record indicates that when one looks at the land involved in both Subdivisions Nos. 1 and 2 ... one observes that the plan *as shown on the respective plats and supplements* was actually carried out." *Id.* at 90, 304 A.2d 788 (emphasis added). And the conclusion of the Court with regard to notice to the offending property owners did not depend on such extrinsic evidence: "In our opinion, the chancellor properly ruled that the appellants had constructive notice of the restrictions applicable to the lots in Subdivision No. 2 *by the recordation of the supplement, the plat and the Bury deed."* *Id.* at 91, 304 A.2d 788 (emphasis added).

In *Bernui,* we addressed a case in which the trial court had found that a lot, which was not subject to the declaration of covenants, was nevertheless subject to the covenant-like restrictions arising from a general scheme of development. On reversing that decision, we emphasized that "[t]he declaration of covenants detailed the property subject to the restrictions," and that the lot in question was not part of that property. *Bernui,* 62 Md.App. at 19, 488 A.2d 186. *Bernui* presented a somewhat different issue than the case sub judice. There the lot in question was after-acquired property. *Id.* at 16–17, 488 A.2d 186. Yet, *Bernui* may still be read for the principle that property not included in a subdivision, as evidenced by a recorded declaration of covenants, will not be found to be part of a general scheme of development.

### *Effect of Recorded Declaration of Covenants on Determination of Property Included*

Neither party has cited, nor have we been able to find, a Maryland case that deals with the question of whether contemporaneously-owned property not included in a written and recorded declaration of covenants, which declaration exactly describes the property to be encumbered and benefitted, may be included in a general scheme of development and thus encumbered by the scheme's restrictions. The dearth of authority may be explained by the fact that the presence of a recorded declaration of covenants connotes a common development scheme dramatically different from the situation found in *Turner,* wherein a common development scheme and its extent must be inferred from the scattered evidence of individual deeds and plats, from the course of the development, from representations made by the developer and/or his agents, and from other extrinsic evidence. *See* Restatement (Third) of Property: *Servitudes* § 2.14 cmt. f ("If land is subdivided according to a recorded plat and servitudes are imposed on each lot, whether by declaration, restrictions in the plat, or substantially similar restrictions in each deed, the conclusion that the development occurred pursuant to a general plan is easily reached. The difficult cases involve subdivisions with-

out a recorded plat, or without substantially uniform deed restrictions."); 7 *Thompson on Real Property* § 62.14, at 520–21 (David A. Thomas ed., 1994) (comparing the case in which "proper procedures are followed in drafting and recording the system of restrictions" with "[t]he more challenging and problematic use of the common scheme ... where a developer has not followed careful procedures").

Although Maryland courts have not addressed the issue directly, the courts of other jurisdictions have, and their opinions seem to be unanimous. Although the fact patterns of those cases are various, the principle is the same: when a common development scheme or subdivision is established by a recorded document setting forth the restrictions upon the property, which document also describes the property to be included, the presumption is raised that only the property therein described will be included in, and thus burdened and benefitted by the restrictions of, the common development scheme. *See Gammons v. Kennett Park Development Corp.,* 61 A.2d 391, 397 (Del.1948) (affected property described in dedication deeds); *Stowe v. Briggs,* 451 S.W.2d 152, 154 (Ky.1970) ("Master Restrictions"); *Lillard v. Jet Homes, Inc.,* 129 So.2d 109, 112 (La.Ct.App.1961) ("declaration of restrictive covenants"); *Craven County v. First–Citizens Bank & Trust Co.,* 237 N.C. 502, 75 S.E.2d 620, 628–29 (N.C.1953) ("declaration of trust"); *Edwards v. Surratt,* 228 S.C. 512, 90 S.E.2d 906, 911 (S.C.1956) (dedication deed); *Jobe v. Watkins,* 458 S.W.2d 945, 948 (Tex.Civ.App.1970) ("dedication"); *Bein v. McPhaul,* 357 S.W.2d 420, 425 (Tex.Civ.App.1962) (dedication deeds); *Davis v. Congregation of Shearith Israel,* 283 S.W.2d 810, 814 (Tex.Civ.App.1955) (declaration of restrictions); *Moody v. City of University Park,* 278 S.W.2d 912, 923 (Tex.Civ.App.1955) (dedication deed); *Forbes v. Schaefer,* 226 Va. 391, 310 S.E.2d 457, 462–63 (Va.1983) ("General Restrictions"); *Duvall v. Ford Leasing Development Corp.,* 220 Va. 36, 255 S.E.2d 470, 473 (Va.1979) ("deeds of dedication"); *Shirlington Drug Store, Inc. v. Shirlington Corp.,* 199 Va. 112, 97 S.E.2d 652, 657 (Va.1957) (dedication deeds); *Meagher v. Appalachian Electric Power Co.,* 195 Va. 138, 77 S.E.2d

461, 467 (Va.1953) (declaration of covenants); *see also* Restatement (Third) of Property: Servitudes § 2.14 cmt. g ("When a tract is developed in phases, with separate units or subdivisions, the imposition of servitudes in one phase should not give rise to the implication of reciprocal servitudes burdening the remaining units or subdivisions, unless the developer clearly represented to purchasers that the remaining units would be subject to the same restrictions as the earlier ones, under circumstances that would justify enforcement of an express oral promise to impose restrictions on the remaining land under § 2.9."); Maurice T. Brunner, Annotation, *Who May Enforce Restrictive Covenant or Agreement as to Use of Real Property*, 51 A.L.R.3d 556, 621–22 (1973) ("Where a developer of a large tract of land independently and successively subdivides and restricts separate sections of the tract, each subdivision being restricted by a separate set of building restrictions, the benefit of the restrictions in each subdivision is limited to the lots within the subdivision, and cannot be enforced by the lot owners of the adjoining subdivision merely because they were subdivided by the same developer."); John C. Paulus, *The Use of Equitable Servitudes in Land Planning*, 2 Willamette L.J. 399, 412 (1963) ("When the subdivider is developing a large restricted area including several subdivisions, the declaration in each plat will normally limit the benefit of the restriction to the lots within the unit, and so only purchasers of lots in the same plat can enforce the restrictions *inter se*."). These cases base their conclusions on several principles of law. First is the rule that restrictive covenants are to be strictly construed and doubts are to be resolved in favor of the free use of property. *See, e.g., Lillard*, 129 So.2d at 113; *Craven County*, 75 S.E.2d at 629; *Edwards*, 90 S.E.2d at 909. Second is the precept that "what is implied must give way to what is actually expressed." *Forbes*, 310 S.E.2d at 463 (quoting *Duvall*, 255 S.E.2d at 473). And last is the principle that the intent to bind a given piece of property must be clearly expressed. *See, e.g., Gammons*, 61 A.2d at 394; *Edwards*, 90 S.E.2d at 911; *Forbes*, 310 S.E.2d at 462.

These principles comport with our law. *See Belleview Construction Co. v. Rugby Hall Community Association, Inc.,* 321 Md. 152, 158, 582 A.2d 493 (1990) (restating rule favoring unrestricted use of property); *Glenn v. Mayor and City Council of Baltimore,* 67 Md. 390, 400, 10 A. 70 (1887) (quoting *Morris v. Harris,* 9 Gill. 19, 27 (1850)) (" 'All covenants that arise from implication of law, are necessarily controlled or annulled by other express covenants between the parties.' "); *Maryland Trust Co. v. Tulip Realty Company of Maryland, Inc.,* 220 Md. 399, 409, 153 A.2d 275 (1959) ("[A] restrictive covenant will not be extended by implication beyond the original intent of the contracting parties so as to include an area not clearly expressed in the agreement or deed of the contracting parties."). Nor is the rule contrary to our case law of implied reciprocal negative easements as discussed above.

■ Consequently, we hold that when the restrictions that form, or form a part of, a general scheme of development are contained in a duly recorded document, which document describes the property to be so restricted, a presumption that the restrictions extend only to the property thus described is thereby raised.

In the present case, the following facts were established: the initial "Lot Reservation Agreement" provided a full release from the sales contracts if the purchasers disapproved of the covenants, at that point in time still to be drafted and recorded; the Declaration clearly indicated which property was included in the common scheme; the Declaration was recorded before any lots were sold; and each of the appellees' deeds incorporated the Declaration by reference.[2] Given these facts, the presumption that the Chapel Woods II common development scheme is limited to the property described in the Declaration is not overcome. The trial court erred in

---

2. Each "Agreement of Sale" also apparently included a copy of the Declaration. The table of contents of the copy of the Agreement included in the record lists the Declaration, but the Agreement does not include a separate copy of the Declaration.

concluding that Lot 7 was part of the common development scheme and thus subject to its restrictions.

### *Interpretation of the Declaration's*
### *Covenants and Restrictions*

■ Having ruled that Lot 7 is not subject to the restrictive covenants as part of a general scheme of development and, consequently, not subject to the injunctive relief offered by the trial court, we note that the succeeding analysis applies only to Lot 8.

The trial court concluded that section 4.1.1.(b) of the Declaration prohibited the subdivision of any existing lot for the purpose of erecting more than one structure in evasion of the restrictive covenant. Section 4.1.1.(b) reads as follows:

> [N]o Lot may contain more than one detached residential Structure at any time (which Structure must be a residential Structure, may constitute not more than one Dwelling, and may be used as a residence at any one time by not more than one family).

The trial court relied in its conclusion on *Belleview,* which presented a case similar to the one at bar. We agree.

In *Belleview,* the Court of Appeals dealt with a conflict arising from the subdivision, by property owners, into two lots of a single encumbered lot. The property owners conveyed the resulting lots—one with a previously erected dwelling, the other unimproved—to a developer who proposed to build a dwelling on the unimproved lot. The building plan was rejected by the community association on the grounds that it violated the restriction on the original lot that "only one single family dwelling for private residence purposes shall be erected on each lot." The Court affirmed the trial court and the Court of Special Appeals, and concluded:

> We think it is clear the limitation that "only one single family dwelling ... shall be erected on each lot" refers to each lot conveyed by the developer. The deed of covenants made specific reference to the intention of the developer to "sub-divide a certain portion of [a] tract of land into lots for

sale to the public." The deed further provides that "all lots of ground sold out of the ... tract shall be subject to the ... covenants, conditions, and restrictions...." The restrictions were for "the mutual benefit to be derived by the developers and the purchasers." The general plan of development was for an attractive and desirable community consisting of lots of substantial but varying sizes, with little or no repetition in shape. Though contemplated, and soon to be put in place, there were no zoning or subdivision regulations controlling this portion of Anne Arundel County at the time the original covenants were recorded. The developer who conceived the community, and those who bought from him, had every right to rely upon the carefully conceived plan of development, and to rest assured that the lots created by the developer and to which the restrictions attached, would not subsequently be divided into such pieces as might satisfy zoning and subdivision regulations which might thereafter be adopted.

*Belleview*, 321 Md. at 158–59, 582 A.2d 493 (alterations in original) (footnote omitted). We believe that this conclusion, *mutatis mutandis*, applies in the present case as well.

The appellants challenge the trial court's conclusion with several arguments. First, they assert that subdivision is permitted under the Declaration. Without so holding, we do not necessarily disagree. We do not think, however, that permitting that conclusion would advance the appellants' ultimate argument. Subdivision may be permitted; building "more than one detached residential Structure" per original lot is not. As the *Belleview* Court approvingly paraphrased the holding of the trial court, "although an owner might lawfully subdivide an original lot in accordance with county regulations, that did not create a right to construct an additional dwelling prohibited by the restrictive covenants." *Id.* at 156, 582 A.2d 493.

The appellants then argued that the relevant provisions of the Declaration, taken together, demonstrate that the restriction of one dwelling per lot does not refer to the original lots. We disagree. Section 2.1 of the Declaration provides that

"[t]he Property [defined in section 1.13 and Exhibit A as Lots 1–5 and 8–25] shall contain twenty-four (24) residential lots ('Lots'). Each Lot shall be known by a number corresponding to the number shown with respect to it on the Community Plat." [3] Section 2.2 says that "[t]he location, dimensions and configuration of each Lot within the Community are shown on the Community Plat." The Community Plat is defined in section 1.3 by reference to specific, numbered plats in the Howard County land records. Against these rather specific descriptions, the appellants point to section 1.8, which defines "Lot" as "any plot of land now or hereafter shown on the Community Plat, together with all buildings and improvements thereon," and section 7.5.3, which allowed any owner "to amend the Community Plat with respect to those Lots owned by such Owner without the consent of any other Owner, so long as such amendment complies with all laws, ordinances, rules and regulations of the County and the State of Maryland."

The appellants read these provisions to permit unlimited resubdivision, so long as it conformed to zoning and other legal requirements. The appellees read them otherwise.

> In construing the meaning of a restriction on the use of land, the court must determine the intent and purpose of the parties at the time the agreement was made, which is a question of fact. In making that determination the court must consider the language of the instrument itself, giving the words their ordinary and generally understood meaning. . . .

*Metius v. Julio,* 27 Md.App. 491, 498, 342 A.2d 348, *cert. denied,* 276 Md. 747 (1975). The court below resolved this apparent conflict between the rather firm descriptive provisions of the Declaration and the other, amendment-oriented provisions this way:

---

**3.** The appellants admitted in oral argument that this number created an ambiguity, particularly given the fact that Exhibit A, which defines the "Property," lists only twenty-three lots. We consider it a drafting error, which should be read as "twenty-three (23)."

The intention of the parties as it appears or is implied from said provision is that any lot owner or the Declarant would not be required to seek approval for an amendment of the Community Plat solely to accommodate necessary adjustments to lot lines (or other minor deviations from the Community Plat) which may arise during the course of development or home construction.

The trial court based this interpretation on the clear language of the Declaration. We will not disturb the trial court's conclusions of fact, based on the evidence presented, unless they are clearly erroneous. Md. Rule 8–131(c); *see also Shallow Run Limited Partnership v. State Highway Administration*, 113 Md.App. 156, 173–74, 686 A.2d 1113 (1996). We do not find them so.

Finally, the appellants sought to distinguish the present case from *Belleview*. They noted that the complainants in *Belleview* originally bought into a covenant system that was erected in 1952, before the zoning code of the county had been passed, whereas in the instant case the appellees purchased their lots with knowledge of the existence of a system of zoning, a system that the appellants suggest could be used to change the size of lots in the community. The appellants neglect to note that the *Belleview* covenants were renewed by a majority of the lot owners in 1982, long after zoning was introduced and before the resubdivision was attempted and the construction proposals made. *Belleview*, 321 Md. at 155, 582 A.2d 493.

The appellants also point to the fact that the *Belleview* covenants were changed in the 1982 extension and amendment process, dropping a clause prohibiting more than one dwelling per lot "without the written permission of 'THE DEVELOPERS,'" thus implying that resubdivision had once been contemplated, but subsequently disallowed. The Court did not address the significance of this change, but did note that during the amendment process the community association "was substituted for the developer as the party having authority to approve plans for construction, to grant variances from set-back requirements, to approve fences, and the like." *Id.*

In any event, the Court concluded that, whether it looked at the original covenants or the amended ones, "the result is equally clear." *Id.* at 159, 582 A.2d 493.

Again, the appellants attempt to distinguish *Belleview* on the ground that there had been no resubdivision of any of the community's lots, whereas, in the present case, one lot was actually resubdivided and a house built on the resulting unimproved lot. That fact was not, however, dispositive for the *Belleview* Court, which found that it merely "furnishes additional evidence" for construing the covenants. *Id.* at 160, 582 A.2d 493.

Finally, the appellants point out that the *Belleview* Court distinguished several foreign cases wherein other courts found that provisions requiring minimum lot size were indicative of an intent to allow resubdivision. *Id.* The appellants suggest that the minimum house size provision of the Declaration (section 4.1.1(c)) serves the same function. The appellants are forced to admit, however, that the Declaration contains no minimum lot size provision, just as the covenants in *Belleview* did not.

In sum, the appellants have persuaded us neither that *Belleview* does not control nor that the trial court erred in its conclusion with regard to the interpretation of the restrictive covenants and their application to Lot 8.

### The Effect of Subdivision Approval
### Upon Restrictive Covenants

The appellants argue that the appellees' attempt to enforce the restrictive covenants with regard to the proposed resubdivision was moot because Howard County had given approval to the appellants' subdivision plan and they had recorded the appropriate plats. In making this argument, the appellants have misunderstood the principle that zoning regulations and restrictive covenants are two concurrent but separate systems of law.

In *Perry v. County Board of Appeals for Montgomery County*, 211 Md. 294, 127 A.2d 507 (1956), the Court of

Appeals addressed an argument by property owners who were appealing the zoning decision of a county board of appeals. The appellant property owners argued that the zoning board of appeals should have taken account of restrictive covenants covering the property in question, particularly in light of a section of the county zoning ordinance that provided that the ordinance would not interfere with covenants and other such agreements. The Court rejected that argument, concluding:

> This part of the zoning ordinance does not say, nor should it be taken to mean, that the rest of the ordinance must not be administered and decisions made under it, solely on the basis of its own provisions. The ordinance does not override or defeat whatever private rights exist and are legally enforceable, but neither is it controlled in its workings or effects by such rights. The enforcement of restrictive covenants is a matter for the exercise of the discretion of an equity court in the light of attendant circumstances.

*Id.* at 299–300, 127 A.2d 507. Provided that private covenantal rights do not violate local governmental land use restrictions, the land use restrictions will not affect the private covenantal rights. *See Martin v. Weinberg,* 205 Md. 519, 527–28, 109 A.2d 576 (1954) ("Contractual restrictions are neither abrogated nor enlarged by zoning restrictions."). Therefore, notwithstanding local governmental approval of a resubdivision plan, injunctive relief is entirely appropriate for violations of private covenants and restrictions, as we have found in the past. *See Souza v. Columbia Park and Recreation Association, Inc.,* 70 Md.App. 655, 657, 522 A.2d 1376 (1987), *cert. denied,* 310 Md. 130, 527 A.2d 51 (1987).

### Conclusion

Because we have held that Lot 7 is not part of the common development scheme and have upheld the trial court's interpretation of the restrictions found in the Declaration with regard to Lot 8, we need not reach the appellants' final contention that the Chapel Woods III resubdivision as proposed would come within the Chapel Woods II common development scheme.

In summary, we reverse the trial court's grants of declaratory and injunctive relief with regard to Lot 7. We affirm the trial court's ruling with regard to the interpretation of the restrictive covenants contained in the Declaration, and we affirm the grants of declaratory and injunctive relief with regard to Lot 8.

**JUDGMENT AFFIRMED IN PART AND REVERSED IN PART.**

**COSTS TO BE DIVIDED EQUALLY BETWEEN APPELLANTS AND APPELLEES.**